UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                         :

ROBERTA C. TSE,                            :

                        :

               Plaintiff,          :

                        :          03 Civ. 6234 (GEL)

        -against-           :

                        :         **OPINION AND ORDER**

UBS FINANCIAL SERVICES, INC.,      :

                        :

              Defendant.     :

                        :
------------------------------------------------------------x

John Beranbaum, Jason J. Rozger, and Kristen E. Finlon,
Beranbaum Menken Ben-Asher & Bierman LLP,
New York, NY, for plaintiff.

Kenneth J. Kelly, Mary Gambardella, Jennifer M. Horowitz,
and Erin M. Carney, Epstein Becker & Green, P.C.,
New York, NY, for defendant.

GERARD E. LYNCH, District Judge:

       Plaintiff Roberta C. Tse sued defendant UBS Financial Services, Inc. ("UBS"), alleging

that UBS discriminated against her on the basis of her race and gender by placing her on a

business development plan ("the Plan") – a kind of probationary restrictive duty – and eventually

terminating her employment. After a nine-day trial, a jury returned a verdict for plaintiff on her

gender discrimination claim insofar as it was predicated on her placement on the Plan, and

rejected her remaining claims, including her claim of discriminatory termination. The jury

awarded plaintiff $56,000 in emotional distress damages, $500,000 in economic damages, and

$3,000,000 in punitive damages. Defendant now moves for judgment pursuant to Fed. R. Civ. P.

50(b), or, in the alternative, for a new trial or remittitur pursuant to Fed. R. Civ. P. 59.

Defendant also moves for sanctions for plaintiff's alleged discovery abuses.

Defendant's motion for judgment as a matter of law will be denied in its entirety, and defendant's motion for a new trial will be granted in part; the Court will order a remittitur to $45,000 on the economic damages award, and to $300,000 on the punitive damages award. Defendant's motion for sanctions will be granted in part and denied in part.

## BACKGROUND

A short recounting of the background facts and proceedings at trial will be provided here at the outset. Additional facts will be discussed in later portions of this opinion as they relate to the post-trial motions. To the extent relevant to defendant's motion for judgment as a matter of law, the primary factual narrative will describe events taking the evidence in the light most favorable to the plaintiff. Where relevant, however, in the interest of explaining the development of the record, or in connection with defendant's other motions, disputed issues of fact and conflicting evidence will be discussed.

In 1998, Roberta Tse, an Asian woman, was hired by UBS as a Financial Advisor ("FA") for UBS's Madison Avenue Branch. (Tr. 80, 85.) Tse was hired by David Zoll, the Branch Manager of the Madison Avenue Branch. Tse was moderately successful during her first few years at UBS, ranking neither at the top nor the bottom of the FAs on UBS's evaluation criteria. (Id. 121-23; see Pl. Ex. 47.) However, Tse's production took a downturn in 2001, due in part to the transfer of one of her largest accounts to a different UBS analyst and to the declining economy. (Tr. 696-97.) By early 2002, Tse was one of the lowest-producing FAs in the Madison Avenue Branch. (Pl. Ex. 47.)

In February 2002, Tse met with Jason Chandler, who had replaced Zoll in January 2001 as Branch Manager of the Madison Avenue Branch, to discuss the downward trend in Tse's

production levels. (Tr. 137.) Also as a result of that downward trend, in March 2002, Chandler moved Tse from her office to a cubicle (id.), and in May 2002, Chandler placed Tse on a business development plan. (Id. 710.) According to Chandler, the general goal of a business development plan was to provide "coaching" to struggling FAs in order to "aid[] [an FA's] development with their own understanding of their business." (Id. 708.) In Tse's case, Chandler claimed that the Plan was specifically directed towards "increas[ing] [her] assets and therefore increas[ing] new clients." (Id. 837.) Although several other FAs had also experienced a recent decline in their production levels, none of the other low-producing FAs – almost all of whom were male – was also placed on a business development plan at that time.

Chandler revised the Plan twice to reflect certain concerns expressed by Tse about its duration and terms. (Id. 534-35; see Pl. Ex. 12.) Under the final terms of the Plan, Tse was required (1) to be in the office between 9 a.m. and 5 p.m. on weekdays; and (2) to increase her assets under management by $6 million over the following six months, equivalent to $1 million a month. (Pl. Ex. 13.) The Plan thereby mandated a 40% increase in her client asset base over six months. (Tr. 159, 730.) The Plan stated that Tse could be subject to disciplinary action, up to and including termination, if she failed to meet its requirements. (Pl. Ex. 13.) If Tse failed to meet the requirements the plan provided, Chandler would "then set new goals to be accomplished over the subsequent 120-day period." (Id.)

Chandler met with Tse twice during the term of the Plan to discuss her job performance, and revised the Plan twice more to reflect her new goals. (Tr. 712.) On December 2, 2002, Chandler again met with Tse and told her that she had failed to meet the requirements of the Plan. (See id. 177, 560-61, 566; see also id. 234 (describing Tse's production in 2002 as

"[l]ousy").)  At that meeting, Chandler and Tse also discussed the internal grievance Tse filed

with UBS's Human Resources Department on November 8, 2002, regarding her placement on

the Plan, as well as the discrimination claim she had filed against UBS with the New York State

Division of Human Rights on November 13, 2002.  (Id. 206-07.)  The meeting was adjourned for

a day to give Chandler the opportunity to "think about [the] things that [Tse and Chandler]

discussed" at the meeting.  (Id. 879.)

Tse and Chandler met again on December 3.  (Id. 563.)  At the December 3 meeting,

Chandler and Tse again discussed her pending discrimination claim.  (Id.)  Chandler also asked

Tse what her plan was with respect to her future at UBS.  (Id. 880.)  Tse replied that she still

"wanted to be successful," and that she wanted to continue working at UBS and improve her

performance, despite her failure to meet the Plan's goals.  (Id. 882; see id. 887 (testifying that

plaintiff told Chandler at the December 3 meeting that she "wanted to have a go at" her job); Pl.

Ex. 68.)  In response, Chandler told Tse to continue the job "as best as" she could and to

continue to "serve [her] clients."  (Tr. 219.)  No disciplinary action was taken against Tse at that

time, nor was Tse placed on another business development plan.  (See id. 565 (testifying that Tse

believed, and Chandler said, that Tse "could continue to do business as [she] had been doing"

after the Plan expired).)  However, on January 29, 2003, UBS sent Tse a termination letter.  (Pl.

Ex. 36.)  The termination letter informed Tse that she had "been absent from work without

excuse for 35 of the last 37 days," and stated the reason for her termination as job abandonment.

(Id.)

On August 19, 2003, Tse initiated this action, contending that her placement on the Plan

and her termination were motivated by a discriminatory animus on the basis of her race and

gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 296 et seq. ("SHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107 et seq. ("CHRL").  On June 16, 2005, defendant moved for summary judgment on Tse's gender and race discrimination claims insofar as they were predicated on her placement on the Plan, contending that the Plan did not constitute an adverse employment action as a matter of law.  On December 13, 2005, the Court denied that motion, finding that whether the Plan created a "materially significant disadvantage" to plaintiff's employment was a genuine issue of fact.  (12/13/05 Tr. 5-6.)

Trial was held from April 2-13, 2007.  At trial, plaintiff did not attempt to dispute that her measurable job performance was weak in comparison to the full range of other FAs.  Rather, she compared her treatment primarily to that of other low-performing FAs who were male, and adduced evidence showing that, although the performance of several male FAs was also declining in early 2002, none of them was placed on a business development plan, nor did any of them suffer any disciplinary measure for their low production (See, e.g., Tr. 714-27.)  Indeed, one low-producing male FA, Neal Cooper, was promoted despite consistently being ranked in the lowest quartile.  (See id. 701-02; Pl. Ex. 47.)  Chandler testified, however, that plaintiff's alleged comparators were not similarly situated to her for various reasons, including that, out of all the low-producing FAs, plaintiff had exhibited the most "severe decline" in production during the period that Chandler was Branch Manager.  (Tr. 827.)

Another matter disputed at trial was whether Tse had voluntarily abandoned her job, or whether UBS had terminated her, either for legitimate or for discriminatory reasons.  Although Tse's termination letter charged that she had not shown up for work on 35 out of the 37 days

prior to her termination, Tse vigorously disputed that she abandoned her job, claiming that she had been in the office several times during that period (id. 1358), that when not in the office she had been working from home and meeting clients (id. 236), and that Chandler had planned to terminate her since the end of November 2002 but had not done so due to her pending discrimination claims (see Beranbaum Decl. Ex. 2). In response, Chandler testified that he never saw Tse again in the office after their December 3 meeting (Tr. 883), and defendant submitted testimony and documentary evidence indicating that Tse had not used the UBS computer system nor responded to attempts by UBS employees to contact her since early December 2002. (See Def. Exs. 36-38, 45-46.)

Also hotly disputed at trial was Tse's post-employment economic damages calculation. In support of her claim for post-employment economic damages, Tse submitted a chart purporting to show that she had suffered a loss of approximately $1.65 million in pay due to her alleged discriminatory termination. (Pl. Ex. 110.) Defendant objected to admission of the chart, arguing that it was seriously misleading because of various omissions and miscalculations (Tr. 305), including the fact that it significantly overestimated Tse's yearly earnings at UBS (see id. 1274-78; Def. Ex. 77). Although the Court expressed serious doubts about the accuracy of the chart at that time, characterizing it as "remarkably misleading" (Tr. 1303), and noted that Tse's failure to disclose her calculation prior to trial might have prejudiced defendant (id. 1304-06), the Court nevertheless found that defendant could address the chart's inaccuracies and omissions during cross-examination, and that defendant's objections would be better addressed by post-trial motions, "where there [could] be a better analysis of prejudice." (Id. 319; see id. 1435 (noting that plaintiff's economic damages calculation had been "cross-examined to death").)

Accordingly, the Court admitted the chart into evidence.[1] (Id. 1304.) However, the Court also noted that "if there is a verdict for the plaintiff in any amount that looks like the amount on the chart, [the Court] would have to seriously consider any new trial motion that was made on the grounds that information was presented to the jury that is just plain inaccurate." (Id.)

After the close of plaintiff's case, defendant moved for a directed verdict on all of plaintiff's claims pursuant to Fed. R. Civ. P. 50(a), contending that plaintiff had not adduced sufficient evidence to permit a reasonable jury to find that either her placement on the Plan or her termination were motivated by a discriminatory animus. (Id. 1307.) The Court denied defendant's motion, finding that "there [was] adequate information on which a jury could reach a conclusion that there was different treatment, that among the poorly producing financial advisors at this branch . . . Ms. Tse was the one who was singled out to be put on a business development plan." (Id. 1308.) The Court noted that Tse's success would depend on the jury's "credibility determinations" as to whether "males who were arguably comparable were allowed to slide," while Tse was placed on the Plan. (Id.)

On April 12, 2007, the jury returned its verdict, finding that defendant had unlawfully placed Tse on the Plan because of her gender, but rejecting her other claims of race and gender discrimination, including her claims of discriminatory termination. The jury awarded Tse $56,000 in damages for emotional distress, $500,000 in economic damages, and $3,000,000 in punitive damages.

---

[1] Plaintiff revised the chart somewhat to simplify her damages calculation (Tr. 631-33; Pl. Ex. 110), but most of the inaccuracies and omissions remained in the revised chart (Tr. 1287 ("[T]here's absolutely no reflection of any corrections in [the revised chart] except a net new asset bonus and one other minor item."); see Def. Reply 20 (characterizing the revised chart as "still inaccurate and prejudicial")).

On May 14, 2007, defendant moved for judgment as a matter of law or a new trial, contending, inter alia, that (1) the Plan did not constitute an adverse employment action as a matter of law; (2) plaintiff was not similarly situated to low-producing male FAs who had not been placed on a business development plan; (3) plaintiff failed to establish any economic loss as a result of being placed on the Plan; and (4) the punitive damages award was unwarranted and grossly excessive. Defendant simultaneously moved for sanctions for plaintiff's alleged discovery abuses and for her failure to disclose the damages chart prior to trial. Plaintiff responded to both motions on June 13, 2007; the motions were fully briefed as of June 27, 2007.

## DISCUSSION

Sufficient evidence was adduced at trial to support the jury's finding that plaintiff's placement on the Plan was discriminatory, and the Court will not disturb that finding. However, the jury's calculation of economic and punitive damages was erroneous; therefore, the Court will order a remittitur to $45,000 in economic damages and to $300,000 in punitive damages.[2] If plaintiff does not accept the remitted amount, defendant is entitled to a new trial on the issue of economic and punitive damages.

### I.     Legal Standards

Federal Rule of Civil Procedure 50(a) provides that where there is no "legally sufficient evidentiary basis" for a reasonable jury to find for a party on a particular issue, the court may resolve the issue against that party and may "grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or

---

[2] Defendant does not challenge the jury's award of emotional damages, which accordingly will remain in place.

defeated only with a favorable finding on that issue." Under Rule 50(b), if the court does not grant a motion for judgment as a matter of law at the close of all the evidence, "[t]he movant may renew its request . . . by filing a motion no later than 10 days after entry of judgment – and may alternatively request a new trial or join a motion for a new trial under [Fed. R. Civ. P.] 59." Fed. R. Civ. P. 50(b).

A movant seeking to set aside a jury verdict faces a "high bar." Lavin-McEleney v. Marist Coll., 239 F.3d 476, 479 (2d Cir. 2001). A jury verdict should be set aside under Rule 50 only where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or where there is "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him." Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 79 (2d Cir. 2006) (citation and internal quotation marks omitted). In applying this standard, a court must not make credibility assessments and must view the evidence in the light most favorable to the non-moving party. See Gordon v. Matthew Bender & Co., 186 F.3d 183, 184 (2d Cir. 1999).

Pursuant to Federal Rule of Civil Procedure 59(a)(1), a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." The standard for granting a new trial differs in two ways from that governing Rule 50 motions: (1) a new trial may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133-34 (2d Cir. 1998) (citation omitted). Although a trial court is afforded considerable discretion under

Rule 59(a), a motion for a new trial should be granted only when, in the opinion of the district court, "the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." Id. at 133, quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992) (alteration in original). Accordingly, a court should rarely disturb a jury's evaluation of witness credibility. Id. at 134. Moreover, the mere fact that the trial judge disagrees with the jury's verdict is not a sufficient basis to grant a new trial. Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir. 1983).

In some cases, a remittitur provides an appropriate alternative to granting a new trial. "Remittitur is the process by which a court compels [the party that prevailed at trial] to choose between reduction of an excessive verdict and a new trial." Cross v. N.Y. City Transit Auth., 417 F.3d 241, 258 (2d Cir. 2005) (citation and internal quotation marks omitted). Depending on the grounds for the remittitur, the new trial may be either on the underlying claims generally or limited to the issue of damages only. See Tingley Sys., Inc. v. Norse Sys., Inc., 49 F.3d 93, 96 (2d Cir. 1995). The court may require a choice between a new trial and reduction of a verdict "where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken," or "where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 337 (2d Cir. 1993) (citation and internal quotation marks omitted). Remittitur may also be warranted where it can be demonstrated that the jury awarded specific amounts of damages that were not supported by the record. Id. (explaining that "[i]f it could be demonstrated that the verdict included any of [plaintiff's] unsubstantiated damages claims, the

10

award would be by definition excessive," and remittitur would be appropriate).

## II.     Gender Discrimination

Defendant's motion for judgment as a matter of law with respect to the jury's liability determination is unavailing.  Based on the evidence adduced at trial, the jury reasonably found both that the Plan was an adverse employment action, and that plaintiff was treated less favorably than similarly situated male FAs.  Therefore, the Court may not disturb the jury's liability determination in this case.

### A.     Adverse Employment Action

In order to establish liability for gender discrimination, plaintiff must show that she suffered a material adverse employment action because of her gender. "[M]aterially adverse change[s]" in the terms and conditions of employment include, but are not limited to, discharge, refusal to hire, denial of promotion, decrease in wages, salary or benefits, or significantly diminished responsibilities.  See Galabaya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).  Although "[a] 'materially adverse' change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities," id., an adverse employment action may be found where the action affects the employee's future employment "opportunities,"  Pimentel v. City of New York, No. 00 Civ. 326, 2002 WL 977535, at *4 (S.D.N.Y. May 14, 2002).  See Bernheim v. Litt, 79 F.3d 318, 325 (2d Cir. 1996) (holding that a change that harms a plaintiff's reputation, opportunities for advancement, and earning potential may constitute adverse employment action); see, e.g., Casale v. Reo, No. 1:04-CV-1013, 2007 WL 3353217, at *6 (N.D.N.Y. Nov. 7, 2007) (holding that an adverse employment action has occurred even where it is "likely" that the action will have a "material impact" on the employee).

"[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 226 (2d Cir. 2006), quoting Hoyt v. Andreucci, 433 F.3d 320, 328 (2d Cir. 2006). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997).

Defendant argues that, as a matter of law, plaintiff's placement on the Plan was not an adverse employment action. First, according to defendant, "[b]eing placed on a performance plan, standing alone, is not an adverse employment action." (Def. Mem. 6, citing Weeks v. N.Y. State (Div. of Parole), 273 F.3d 76, 86 (2d Cir. 2001).) Specifically, defendant argues that "criticism of an employee" is not an adverse employment action, and cites case law in support of that argument. However, even assuming that "criticism of an employee" alone cannot constitute an adverse employment action as a matter of law, see Weeks, 273 F.3d at 86, the jury could easily have found that the performance plan at issue here was not simply a negative evaluation of plaintiff's job performance, but instead also imposed certain new requirements on the terms and conditions of her employment. Thus, the cases cited by defendant are inapposite, as they all involved situations in which the only undisputed employment action was a negative performance evaluation, without any attendant consequences or alterations in the terms of employment.[3]

_____

[3] See Weeks, 273 F.3d at 86 (finding a negative evaluation not to be an adverse employment action where the evidence did not "describe its effect or ramifications, how or why the effect would be serious, whether it went into any file, or even whether it was in writing"); Young v. Pitney Bowes, Inc., No. 3:03 CV 1161, 2006 WL 726685, at *28 (D. Conn. Mar. 21, 2006) ("[C]riticism of an employee [alone] . . . is not an adverse employment action."); Chamberlin v. Principi, No. 02 Civ. 8357, 2005 WL 1963942, at *5 (S.D.N.Y. Aug. 16, 2005) (finding that plaintiff had not shown an adverse employment action where there was no evidence

Next, defendant argues that to the extent that the Plan did impose new requirements on the terms and conditions of plaintiff's employment, the Plan still did not constitute an adverse employment action, because those new requirements could not reasonably be characterized as "adverse" to her employment. The Court has already rejected this same argument in ruling on defendant's motion for summary judgment, and nothing that transpired during trial undermines the correctness of that ruling.

First, under the Plan, plaintiff was required to be in the office between 9 a.m. and 5 p.m. each day. This requirement in itself restricted Tse's freedom of action, in contrast with her previous circumstances. Moreover, the jury was entitled to credit plaintiff's testimony that forcing her to be in the office during those hours negatively impacted her job performance, for example, because she did not have the necessary resources in the office to do her job efficiently, and/or because she could not meet clients without prior approval from Chandler. Although defendant correctly notes that "[s]howing up for work . . . is a basic requirement of employment" (Def. Mem. 8), such a general, conclusory assertion misses the point of plaintiff's unrebutted testimony, which the jury was entitled to accept, that the requirement of showing up *during specific hours* was explicitly imposed only on her, and not on any other FA in the Madison

---

that "his career opportunities within or without [his place of employment] were damaged as a result of [a] lowered [performance] evaluation"); Weisman v. N.Y. City Dep't of Educ., No. 03 Civ. 9299, 2005 WL 1813030, at *6 (S.D.N.Y. Aug. 1, 2005) ("[A]n unsatisfactory rating itself may not constitute an adverse employment action."); Knight v. City of New York, 303 F. Supp. 2d 485, 497 (S.D.N.Y. 2004) (An "unsatisfactory rating" does not constitute an adverse employment action where there is no "accompanying diminution" in the terms of employment.); Gurry v. Merck & Co., No. 01 Civ. 5659, 2003 WL 1878414, at *5 (S.D.N.Y. Apr. 14, 2003) (no adverse employment action where "Performance Improvement" memo had no "material ramifications" on plaintiff's employment); Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) (no adverse employment action where negative evaluation did not "mark[] [plaintiff] as a less capable analyst").

Avenue Branch.  It is hardly unusual for professional employees to have discretion to allocate their time, including to meet with clients or business prospects outside the office during ordinary business hours, and the jury could reasonably have accepted Tse's testimony that this privilege was extended to UBS FAs, and that limiting this discretion not only reduced Tse's job status, but also harmed her productivity.  Thus, the jury was entitled to find that, even if being in the office from 9 a.m. to 5 p.m. on weekdays is in many contexts an ordinary term of employment, its imposition on Tse was a materially adverse change of employment terms with respect to her job in particular.

Second, under the Plan, plaintiff was required to increase her assets under management by $6,000,000 in six months.  The jury was entitled to credit plaintiff's testimony that increasing her assets by $6,000,000 in such a short period of time was an onerous burden which had materially adverse consequences on her employment.  The Plan required plaintiff to increase her assets under management by $1 million a month, thus mandating a 40% increase in her assets in just six months.  (Tr. 159, 730.)  However, in 2001, only three of the FAs in the Madison Avenue Branch had increased their assets by $1 million a month (id. 944), and in 2002, only four out of forty FAs in the Madison Avenue Branch reached that goal (Pl. Ex. 47).  Thus, 36 of the 40 FAs in the Madison Avenue Branch would not have reached the goal imposed on Tse under the Plan.  Moreover, Chandler admitted that he placed Tse on the Plan in the midst of a severe market downturn, making compliance with the Plan even more difficult.  (Tr. 731.)  Although defendant argues that plaintiff "concede[d]" during trial that increasing her assets by $6,000,000 in six months was "difficult" but "doable" (id. 159), a change in the conditions of employment need not be intolerable or completely impractical in order to constitute an adverse employment action;

it need only be materially adverse to the conditions of employment. The jury reasonably could have found that the imposition of such a high production goal, combined with the poor market conditions at the time of the Plan, created a materially adverse term of plaintiff's employment, by imposing a demand, unique to Tse, that would be extremely difficult to meet.[4]

Third, defendant argues that "the fact that the Plan indicated that 'failure to follow' the Plan may potentially lead to" her termination "does not make the Plan itself an adverse action" because the jury found that she was not actually terminated due to her placement on the Plan, and thus, the threat to terminate her was merely inchoate. (Def. Mem. 10, citing Tr. 159, 534-35.) Even assuming arguendo that a threat of termination alone is not sufficient to constitute an adverse employment action, see Brightman v. Prison Health Serv., Inc., No. 05 Civ. 3820, 2007 WL 1029031, at *7 n.4 (S.D.N.Y. Mar. 30, 2007), the jury was entitled to find that the threat of termination *combined with* the Plan's imposition of new, burdensome conditions of employment was sufficient to constitute an adverse employment action. When an employer imposes new conditions of employment and combines those conditions with a threat of termination for non-compliance, such a combination may give rise to a constructive demotion, thereby creating an adverse employment action. See, e.g., Kelly v. Metro-North Commuter R.R., No. 87 Civ. 5817, 1989 WL 156298, at *8 (S.D.N.Y. Dec. 18, 1989) (finding that "forcing a choice" between discharge and a longer workday constituted a constructive demotion), citing Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561-62 (1st Cir. 1986). Here, when plaintiff was placed on the

---

[4] Of course, the jury could also reasonably have concluded that such a demand was reasonable in light of Tse's otherwise low productivity, or that the burden, however onerous or even unfair, was imposed for non-discriminatory reasons. But these were issues for the jury to resolve.

Plan, she was required to choose between complying with the terms of the Plan – which themselves were adverse to plaintiff's employment – or facing possible termination. (See Tr. 1047 (testimony of Zoll, agreeing that the Plan was a "disciplinary measure"); id. (Zoll: "[I]t's implicit that [a business development plan is] the first step towards . . . exiting the firm, at [UBS's] behest.").) That Tse ultimately was fired for other, non-discriminatory reasons and not because of the Plan does not retrospectively render the imposition of the Plan itself non-adverse. "[A]n employment decision need not result in discharge to fall within the Title VII protection" as long as there is "a cognizable or material impact on the terms or conditions of . . . employment" Sternbridge v. City of New York, 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000).

A comparison between the two business development plans submitted into evidence in this case further supports the reasonableness of the jury's finding that plaintiff's plan was an adverse employment action. The only other UBS employee who was subjected to a business development plan by either Zoll or Chandler was Michael Kosik, a male FA who was placed on a plan in 1999. Whereas plaintiff's plan threatened her with "disciplinary action, up to and including termination" for non-compliance, Kosik's plan included no comparable language. Instead, Kosik's plan informed Kosik that Zoll – the Branch Manager at the time – "look[ed] forward to many more prosperous years at [UBS] with you." (Beranbaum Decl. Ex. 5.) Moreover, whereas plaintiff's plan was copied to senior members of UBS's management and UBS's legal counsel (Tr. 836), Kosik's plan was not sent to anyone except Kosik himself (see id. 533 (perceiving the copying of the Plan to other members of UBS management as a sign that the Plan was a set-up to terminate plaintiff)). Finally, while Tse's plan absolutely required her to increase her assets under management by 40% in six months, Kosik's plan only gave him a

general guideline for improvement.  (Beranbaum Decl. Ex. 5 (advising Kosik to increase the number of his accounts by "20-40").)  The jury could reasonably have found from a side-by-side analysis of the two plans that, while the intent and effect of Kosik's plan was to help him improve his performance, the intent and effect of Tse's plan was to constructively demote her, and place her under a direct threat of termination, and therefore constituted an adverse employment action.[5]

Finally, defendant argues that, because the jury did not find that plaintiff's termination itself was discriminatory, the jury could not reasonably have found that her placement on the Plan was an adverse employment action.  But the facts established during trial do not require that conclusion.  Even if, during trial, plaintiff primarily focused on her termination as the principal adverse consequence resulting from her placement on the Plan, the jury was not constrained to base its findings solely on plaintiff's primary argument; instead, the jury was entitled to credit plaintiff's testimony that the terms of the Plan were a materially adverse change to her employment, while rejecting her testimony that she did not voluntarily abandon her job.  The mixed nature of the verdict does not impugn the reasonableness of the jury's liability finding.

In sum, defendant's motion simply asks the Court to substitute its assessment of the evidence for that of the jury, something it is not permitted to do.  The jury reasonably concluded that plaintiff's placement on the Plan was an adverse employment action.

---

[5] Indeed, the jury apparently did perform just such a comparison, as it specifically requested Kosik's plan during deliberations.  (Tr. 1437.)

B.      Similarly Situated Male FAs

Defendant also argues that there was no evidence from which a reasonable jury could conclude that Chandler placed plaintiff on the Plan because of her gender.  Defendant attacks the jury's finding piecemeal.  First, defendant argues that plaintiff did not offer any evidence of gender-based derogatory comments by Chandler.  (Def. Mem. 14 n.5.)  But such direct evidence of discrimination is unnecessary to establish a discriminatory animus.  Instead, it is well established that a discriminatory animus may be proven both by direct and by indirect evidence, for example, by showing that similarly-situated male FAs were treated more favorably than plaintiff.  Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000); see Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 384 (2d Cir. 2001) ("Demonstrating disparate treatment by comparing one's treatment to that of other similarly situated employees is one of the principal means of showing a Title VII violation.").  Thus, the absence of direct evidence of bias does not establish the absence of a discriminatory animus.

Second, defendant claims that plaintiff did not show that Chandler generally treated other female FAs less favorably than male FAs.  Specifically, defendant claims that the evidence established that Chandler "actively recruited female FAs," took them out to lunch, and promoted other high-performing female employees, and therefore, that the jury could not reasonably have found that Chandler was motivated by a discriminatory animus.  (Def. Mem. 13.)  Defendant's argument is unavailing.  Even if Chandler treated high-performing females as well as high-performing males, the jury could reasonably have found that he treated low-performing females, and specifically plaintiff, differently than he treated low-performing males.  For example, the jury could reasonably have found that Chandler provided all high-performing FAs with the same

opportunities, but that when an FA's production declined, he assisted male FAs to improve their performance through informal discussions and coaching (see, e.g., Tr. 725-26 (testimony of Chandler, agreeing that he took one low-performing FA out to lunch "seven times" during 2001 and 2002 "on [Chandler's] expense account," to "suggest[] ways that [the FA] could improve his business")), while he subjected poorly-performing female FAs, and specifically plaintiff, to harsh and demanding production goals.  Of course, the jury was entitled to consider evidence of Chandler's treatment of other women employees in assessing the reasons for his disciplining of Tse.  But an employer cannot escape liability for discriminating against an employee on the basis of a protected status simply because it can show that it treated other members of the employee's group – especially members who were not themselves appropriate comparators to the victim of discrimination[6] – favorably.  See Connecticut v. Teal, 457 U.S. 440, 453-55 (1982).

Third, defendant argues that the other low-producing male FAs to which plaintiff compared herself at trial were not situated similarly to plaintiff for a variety of reasons, including the fact that plaintiff "had the most negative trend" in production out of any of the low-producing FAs when she was placed on the Plan.  (Def. Mem. 12.)  Thus, defendant argues that a reasonable jury could not have found that the low-producing male FAs were treated more

---

[6] For example, defendant argues that the evidence at trial established that Andreanna Davis was also a low-performing female FA who Chandler treated favorably by absorbing the cost of a loan given to her by UBS and "taking her to lunch more than once."  (Def. Mem. 13-14, citing Tr. 1081-82, 1084.)  Even assuming arguendo that Chandler did not treat Davis less favorably than similarly-situated male FAs, the jury reasonably could have found that Davis was not an appropriate comparator to plaintiff – while plaintiff wanted to remain in her job and improve her performance when she experienced a decline in her production levels, Davis was ready, willing, and eager to terminate her employment.  (See Tr. 1081 ("I was ready to go . . . .  I was thrilled to be released [from UBS].").)  The weight to be given to evidence of this kind is quintessentially a matter for the jury.

favorably than plaintiff because plaintiff had the worst performance of any of the FAs, and that Chandler's decision to place plaintiff on the Plan was therefore a legitimate business decision and not motivated by a discriminatory animus. (See Def. Mem. 16-17 ("Plaintiff's arguments amount to an impermissible request to have the jury substitute its judgment for Chandler's judgment as to how to manage the Branch."), citing Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001).)

This argument is unpersuasive. It is unnecessary to discuss in detail the alleged distinctions between plaintiff and the low-producing male FAs set forth by defendant. It is sufficient to note only that, notwithstanding any differences in the production trends between plaintiff and those male FAs to whom she compared herself at trial, there is sufficient evidence in the record from which a jury could reasonably find that plaintiff was similarly situated to those male FAs. It is undisputed that those male FAs were (before the imposition of the Plan) subject to the same workplace standards as Tse (Tr. 791-93), were all supervised by Chandler, and all had "negative trends" in their production and assets, as did Tse (id. 711-12). Moreover, at trial, plaintiff showed that at least one low-producing male FA had been ranked lower than Tse for each of the three years preceding Tse's placement on the Plan. (Id. 716-17; Pl. Ex. 47.) In addition, plaintiff submitted evidence at trial showing that three other low-producing male FAs had experienced a severe decline in production during the same time period, but Chandler never considered putting them on a business development plan. (See Tr. 722-27; Pl. Ex. 47.) Indeed, it is undisputed that, the very month that Chandler decided to place Tse on the Plan,

another FA – Neal Cooper – was actually the lowest performer.  (Tr. 701.)[7]  Various

performance factors could reasonably be taken into account, and weighed differently by different

evaluators, to arrive at an overall ranking of employee performances.  The jury was entitled to

take the totality of the evidence into account, and to make its own assessment of Tse's and

Chandler's respective self-serving claims about the comparability of the various male FAs, and

of defendant's argument that Chandler had in good faith concluded that Tse was in fact the worst

performer in the group.

Although defendant argues that there are material distinctions between Tse and those

low-producing male FAs (Def. Mem. 14-17), the jury could reasonably have rejected those

distinctions as irrelevant, especially considering the undisputed evidence that Tse's low ranking

was due in large part to circumstances beyond her control, such as her loss of a major account to

another UBS broker (Tr. 132-33, 696), and the declining market (id. 697).  The reasonableness

of the jury's finding is supported further by evidence submitted at trial showing that Chandler

coached male low-performing male FAs more frequently than Tse (id. 1022-23), and that while

Tse was placed in a cubicle as a result of her low ranking, low-performing male FAs were not.

See Lane v. Collins & Aikman Floorcoverings, Inc., No. 00 Civ. 3241, 2002 WL 1870283

(S.D.N.Y. Aug. 14, 2002) (denying motion for judgment as a matter of law where defendant

claimed that regional sales manager was fired because of poor sales performance but other

---

[7] Defendant attempts to draw distinctions between Tse and Cooper by arguing that Cooper was on a different employment track from Tse, but the jury was entitled to disregard that distinction, especially considering Chandler's inconsistent testimony concerning their allegedly different duties.  (Compare Tr. 701 (testifying that Cooper spent 50% of his time on tasks that were unrelated to the FA rankings), with id. 958-59 (testifying that Cooper spent 20% to 50% of his times on those tasks).)

regional sales managers also failed to meet their sales goals). Of course, the jury could reasonably have accepted defendant's arguments; however, it did not.

Thus, as the Court found when it initially denied defendant's Rule 50 motion at trial (Tr. 1308), there was ample evidence that Tse was subjected to disparate treatment on account of her gender in this case. See Graham, 230 F.3d at 39 (deeming the question whether employees are similarly situated to be a question of fact for the jury); Taylor v. Brentwood Union Free Sch. Dist., 143 F.3d 679, 684 (2d Cir. 1998) (explaining that jury was asked to decide whether the plaintiff was treated differently than similarly-situated white employees); Hargett v. Nat'l Westminster Bank, USA, 78 F.3d 836, 839-40 (2d Cir. 1996) (noting that jury was asked to decide "similarly situated" issue); cf. Tomka v. Seiler Corp., 66 F.3d 1295, 1312 n.11 (2d Cir. 1995) (whether two positions are "substantially equal" for Equal Pay Act claim is a question of fact). Accordingly, the jury's liability determination was reasonable, and defendant's motion for judgment as a matter of law on that basis is denied.

## III.    Economic Damages

Next, defendant challenges the $500,000 economic damages award. Defendant argues that plaintiff "failed to establish any economic loss as a result of the Plan" at trial. (Def. Mem. 18.) Specifically, defendant claims that "plaintiff did not present any evidence of economic damages [directly] arising from [her] placement on the Plan" (id. 19), and that plaintiff cannot receive economic damages for any harm incurred after her termination because the jury found her termination to be non-discriminatory. In fact, plaintiff provided sufficient evidence for the jury to find direct economic damage to her from being placed on the Plan, albeit in a lesser amount than the jury awarded, as plaintiff did not establish that economic damages suffered

following her termination were fairly traceable to her placement on the Plan.

A.      Jury Trial

As an initial matter, defendant argues that the issue of economic damages should not have been submitted to the jury at all. Specifically, defendant argues that economic damages constitute equitable relief, and therefore, that plaintiff was not entitled to a jury determination of back pay over defendant's pre-trial objection. Therefore, defendant claims that the entire economic damages award should be vacated by the Court and a new trial ordered on this issue.[8] Defendant's argument is unpersuasive.

Under <u>Robinson v. Metro-North Commuter R.R.</u>, 267 F.3d 147 (2d Cir. 2001), parties in a Title VII employment discrimination case are not entitled to a jury trial on the issue of back pay, which has "historically been recognized as equitable relief under Title VII." <u>Id</u>. at 157. In <u>Broadnax v. City of New Haven</u>, 415 F.3d 265 (2d Cir. 2005), the Second Circuit considered whether "where one party requests a jury trial on the lost wages issue and the party's opponents fail to object, the court is permitted, because the opponents may be deemed to have consented, to submit the issue for a non-advisory jury determination." 415 F.3d at 271. The <u>Broadnax</u> court held that "when a party demands jury consideration of lost wages under Title VII and the party's opponent fails to object, . . . the district court [may] submit the lost wages issue for a non-advisory jury determination." <u>Id</u>. at 272. Thus, under <u>Broadnax</u>, where a party "d[oes] not object to the jury's consideration of front or back pay as outside the scope of [the court's]

---

[8] Were defendant correct that this issue of economic damages should have been decided by the Court, a new trial would not necessarily be required. The Court could presumably make the necessary findings based on the evidence presented at trial, which would supercede the findings made by the jury.

authority," the party "may be viewed as having consented to the jury trial on these issues."

Howell v. New Haven Bd. of Educ., No. 3:02CV736, 2005 WL 2179582, at *6 (D. Conn. Sept. 8, 2005). Similarly, under Fed. R. Civ. P. 39(c), "[i]n an action not triable of right by a jury, the court . . . may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right." Accordingly, the relevant inquiry here is whether defendant "may be viewed has having consented" to the jury determination of plaintiff's back pay claim.

Defendant claims that it objected to a jury determination of plaintiff's economic damages prior to trial. Defendant points to a motion in limine in which it argued that, because plaintiff's discrimination claim was asserted only under Title VII, "it is clear that the issues of back pay and front pay . . . should not be presented to the jury." (Def. Mem. of Law in Support of its Mot. in Limine Concerning Evidence of Back Pay and Front Pay Damages, at 2 (citations omitted).) Plaintiff did not dispute defendant's reading of Title VII. Rather, she proposed to cure defendant's objection by seeking leave to amend the pre-trial order to permit her to add causes of action for her discrimination claims under the SHRL and CHRL. (See Letter from Jason Rozger to the Court, Mar. 7, 2007.) Defendant objected to plaintiff's request, not on the ground that economic damages under the SHRL and CHRL are also to be determined by the Court without a jury, but rather on the ground that allowing plaintiff to amend her claims on the "eve of trial" would unfairly prejudice defendant. (Letter from Mary A. Gambardella to the Court, Mar. 8, 2007.) Because the state and city claims were substantially identical to the Title VII claims, however, defendant was unable to point to any way in which the presence or absence of such claims would alter defendant's trial preparation, or otherwise prejudice it. Both parties

argued on the assumption that if plaintiff's application was granted, and the SHRL and CHRL claims were added, the problem would indeed be "cured" and plaintiff's right to a jury trial would be restored. Indeed, defendant's assertion of prejudice was apparently based in large part on the understanding that the amendment of the pretrial order would subject it to an unanticipated jury trial.

On March 23, 2007, the Court granted plaintiff's motion to amend over defendant's objection. Plaintiff immediately amended the pre-trial order to include causes of action under the SHRL and CHRL. Accordingly, the jury was permitted to determine economic damages on plaintiff's discrimination claims. Defendant did not register any further objection to the Court's ruling before trial, nor did defendant raise the issue again in its post-trial motions. Rather, the issue was first raised only by way of a letter to the Court, submitted three months after the post-trial motions were fully briefed, apparently as a result of the Court's ruling in another case.[9] (Letter from Mary A. Gambardella to the Court, Sept. 24, 2007.)

Defendant argues that its motion in limine was sufficient to preserve its objection to a jury trial on plaintiff's economic damages with respect to her SHRL and CHRL claims. Defendant is incorrect. Although defendant did not consent to a jury trial on plaintiff's back pay claim insofar as that claim was predicated on a violation of Title VII, defendant never objected to a jury trial on plaintiff's SHRL and CHRL claims. Because defendant never "object[ed] to the jury's consideration of front or back pay" under the SHRL and CHRL "as outside the scope of [the jury's] authority" prior to trial, defendant is viewed as "having consented to the jury trial on these issues." Howell, 2005 WL 2179582, at *6. Thus, even if the SHRL and CHRL claims are

---

[9] See note 10 below.

not "action[s] . . . triable of right by a jury," defendant's silence in the face of plaintiff's proposed cure gave rise to a constructive consent to try the claims to the jury. Accordingly, defendant waived any objection to having a jury determine plaintiff's economic damages.

In support of its argument that its right to object to a jury trial on economic damages for claims brought pursuant to Title VII also extends to claims brought pursuant to the SHRL and CHRL, defendant points to this Court's unpublished order in <u>Browne Sanders v. Madison Square Garden, L.P.</u>, 06 Civ. 589 (S.D.N.Y. 2007), in which the Court ruled that, because the SHRL and CHRL "are virtually identical to the Title VII scheme at issue in <u>Broadnax</u>," a party's right to object to a jury determination of economic damages under Title VII applies equally under the SHRL and CHRL. (Order of Sept. 4, 2007, at 3.)[10] According to defendant, therefore, the Court's decision to allow the jury to determine plaintiff's economic damages under the SHRL and CHRL in this case was erroneous. But the Court never actually made any such decision in this case, because, unlike the defendants in <u>Browne Sanders</u>, UBS never presented that issue to the Court prior to trial. Had defendant raised this issue prior to trial, the Court presumably would have agreed with defendant at that time and held that plaintiff was not entitled to a jury trial on any of her claims, including her SHRL and CHRL claims, as it later ruled when this argument *was* advanced by the defendants in <u>Browne Sanders</u>. Indeed, the contrasting outcomes in this case and in <u>Browne Sanders</u> illustrate precisely why parties must raise such issues prior to

---

[10] Indeed, it was apparently the Court's unpublished, in limine ruling in <u>Browne Sanders</u> that first alerted defendants to the argument that it had a right to a non-jury trial on plaintiff's back pay claim under SHRL and CHRL as well as under Title VII. Defendant made that argument for the first time more than five months after trial, and about three months after its post-trial motions were fully briefed, but within three weeks after the Court's unpublished order in <u>Browne Sanders</u>, in which different lawyers from the same firm that represents UBS in this case represented defendant Madison Square Garden.

trial in order to preserve them for later review. By acquiescing in plaintiff's proposed cure, defendant did not provide the Court with the opportunity to address the issue before the back pay issue was tried to the jury. See Wright v. Wilburn, 194 F.R.D. 54, 59 (N.D.N.Y. 2000).

Finally, defendant argues that, regardless of whether it consented to a jury trial on plaintiff's SHRL and CHRL claims, allowing the jury to determine plaintiff's economic damages in this case was "plain error," because such a determination was not "within [the jury's] purview in the first instance." (Letter from Mary A. Gambardella to the Court, dated Sept. 24, 2007, at 2.) Under the "plain error" doctrine, a party's failure to object to a court ruling will not preclude review of that error, where there is "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights,'" and then only if "(4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" Johnson v. United States, 520 U.S. 461, 467 (1997) (alteration in original), quoting United States v. Olano, 507 U.S. 725, 732 (1993).

The plain error standard is not met here. First, with the exception of the Court's ruling in Browne Sanders, it appears that the issue of a plaintiff's right to a jury trial on economic damages under New York State and New York City anti-discrimination statutes has not been ruled on by any other court, including the Second Circuit. Thus, it cannot be said that the law was so "plain" that the Court should have sua sponte recognized, absent any objection from defendant, that plaintiff's proposal to add SHRL and CHRL claims would not restore her right to a jury trial. Second, this specific issue has rarely, if ever, been presented to another court presumably because the majority of parties consent, either impliedly or expressly, to a jury determination of economic damages under Title VII, SHRL, and CHRL. See, e.g., Kaufmann v. Maxim Healthcare Servs., Inc., 509 F. Supp. 2d 210, 213 (E.D.N.Y. 2007) (jury determined

economic damages under Title VII and the SHRL); <u>McGrory v. City of New York</u>, No. 99 Civ.

4062, 2004 WL 2290898, at *1 (S.D.N.Y. Oct. 8, 2004) (same).  If juries have consistently been

granted, without objection, the authority to determine such damages, it can hardly be claimed

that jury resolution of such issues raises "serious[]" doubts about the fundamental fairness of the

proceedings, such as to call into question the "fairness, integrity, or public reputation of the

courts."  <u>Johnson</u>, 520 U.S. at 467.[11]  Thus, the plain error doctrine does not apply in this case.

Accordingly, submission of plaintiff's request for economic damages to the jury was not

erroneous, and therefore, the economic damages award will not be vacated on that ground.[12]

B.      Amount of Economic Damages

Title VII provides that a court finding unlawful discrimination "may enjoin [the

discrimination] . . . and order such affirmative action as may be appropriate, which may include,

but is not limited to, reinstatement . . . with or without back pay or any equitable relief as the

court deems appropriate."  42 U.S.C. § 2000e-5(g).  Under Title VII, the courts have broad

equitable powers to remedy employment discrimination.  <u>See</u> <u>Albemarle Paper Co. v. Moody</u>,

422 U.S. 405, 415-18 (1975).  The presumption that an employee is entitled to back pay is

seldom overcome.  <u>See</u> <u>L.A. Dep't of Water & Power v. Manhart</u>, 435 U.S. 702, 719-20 (1978),

_____

[11] Moreover, even if the Court had not submitted plaintiff's request for economic
damages to the jury for a non-advisory verdict, it is well settled that the Court has the authority
to request that the jury enter an advisory verdict on plaintiff's economic damages, which the
Court could then take into account when making a final determination on damages.  Allowing
juries to make such an important contribution to a judicial decision is inconsistent with any claim
that permitting the jury to determine the issue would adversely "affect the . . . public reputation
of judicial proceedings."  <u>Id</u>.

[12] As the jury's award of economic damages must be remitted in any case, should plaintiff
elect a new trial rather than accept remittitur, the issue of the appropriate finder of fact will
presumably be reopened, and defendant will have another opportunity to address it.

citing Albemarle, 435 U.S. at 421; see also Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1157 (2d Cir. 1994).  Although back pay should not be "awarded automatically in every case," Manhart, 435 U.S. at 719, it should only be denied "for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."  Albemarle, 422 U.S. at 421.

Defendant is incorrect that plaintiff failed to offer sufficient proof that she suffered any economic damages from being placed on the Plan.  Plaintiff was economically harmed by defendant's discriminatory actions, and is entitled to a sum that would reasonably compensate her for that harm.  See Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 144-45 (2d Cir. 1993) ("The purpose of back pay is to completely redress the economic injury the plaintiff has suffered as a result of discrimination.") (internal quotation marks omitted).  Plaintiff offered substantial evidence from which the jury could have found that being placed on the Plan limited her ability to earn commissions in 2002.  The relevant inquiry, then, is not whether plaintiff is entitled to economic damages in this case, but whether plaintiff sufficiently established during trial that a $500,000 award is reasonable compensation for the harm she suffered as a result of being placed on the Plan.  See Bracey v. Bd. of Educ. of City of Bridgeport, 368 F.3d 109, 119 (2d Cir. 2004) (Burden of proving damages is on plaintiff.).

1.      Economic Damages While On The Plan

First, plaintiff offered evidence during trial from which the jury reasonably could have inferred that she suffered economic harm during the six months that she was on the Plan. Plaintiff testified repeatedly that, as a result of being placed on the Plan, she suffered distress

which "contribute[d]" to the decline in her productivity. (Tr. 505.) For example, plaintiff testified that the effect of being placed on the Plan was that she was forced to "start all over again" as an FA. (Id. 514; see id. 164 (The requirements of the plan were "overly aggressive and arbitrary."); id. 175 ("I thought it was setting me up [to fail]."); id. 533 (testifying that UBS was creating a "paper trail – to fire me").) The jury also heard testimony regarding plaintiff's visits to her therapist during the six months that she was on the Plan, which she testified were due to her placement on the Plan. (Id. 334.) See, e.g., Robinson v. Jacksonville Shipyards, Inc., 118 F.R.D. 525, 531 (M.D. Fla. 1988) (considering plaintiff's claim for back pay where economic injury was due to the stress of working in a discriminatory environment).

Moreover, plaintiff offered evidence that the Plan created pragmatic as well as psychological obstacles to her success. For example, plaintiff testified that the rigid work hour requirement, which required her to check with Chandler whenever she needed to be out of the office, hampered her ability to meet with clients and exercise her independent discretion in managing her portfolio. (Tr. 164.) Since plaintiff's entire compensation was contingent on her ability to produce and not on a steady salary, a jury that accepted plaintiff's testimony (as the jury was entitled to do) reasonably could have found that plaintiff's discriminatory conduct caused a decline in her production, and in turn, her earnings. See EEOC v. Yellow Freight Sys., Inc., No. 98 Civ. 2270, 2002 WL 31011859, at *32 (S.D.N.Y. Sept. 9, 2002) (the purpose of back pay "is to make the plaintiff whole").

The jury did not need to resort to "speculation or guesswork" to estimate the amount of plaintiff's damages while on the Plan. See Sir Speedy, Inc. v. L&P Graphics, Inc., 957 F.2d 1033, 1038 (2d Cir. 1992). Plaintiff presented evidence from which the jury could ascertain

those damages.  For example, plaintiff established that her production and earnings declined

dramatically from 2001 to 2002.  (Tr. 540; see, e.g., id. 1272-82.)  In 2001, plaintiff earned

$109,383 in commission and draw.  In 2002, the year she was placed on the Plan, her earnings

dropped to $28,061, a loss of $81,322.  (Def. Ex. 77; Tr. 898.)  The jury reasonably could have

attributed plaintiff's 2002 decline in commissions to her placement on the Plan, and awarded her

damages for the equivalent of six months' drop in income, or $40,661.  Similarly, in 2002,

plaintiff's pre-tax 401(k) contribution dropped from $10,500 to approximately $4,500 (Def. Ex.

77), a loss of $3,000 prorated over six months.  Thus, the jury could reasonably have found that

in 2002 plaintiff suffered losses approximating $45,000 because of her six months' placement on

the Plan.  The cases cited by defendant are inapposite, as the economic damages award in those

cases were based on sheer speculation, and there was a complete lack of evidence supporting the

jury's damages verdict.[13]

Although defendant repeatedly argues that the jury should have found that plaintiff's

decline in production during 2002 was attributed to factors other than her placement on the Plan,

these arguments merely repeat issues of fact previously raised at trial.  The jury's disagreement

with defendant's interpretation of the record is not grounds for setting aside the economic

damages award insofar as it can be attributed to plaintiff's actual economic loss while on the

---

[13] See Bracey, 368 F.3d at 118-19 (finding the economic damages award to be "clearly excessive" where plaintiff submitted "no evidence" that would support the award); Exodus Partners, LLC v. Cooke, No. 04 Civ. 10239, 2007 WL 120053, at *14 (S.D.N.Y. Jan. 17, 2007) (finding that the jury's verdict was based on "rank speculation"); Jones v. Spentonbush-Red Star Co., No. 96 Civ. 4325, 1997 WL 736724, at *1 (S.D.N.Y. Nov. 25, 1997) (granting judgment as a matter of law where plaintiff was "unable to point to any piece of evidence in the record which supports a finding that plaintiff's lost earnings were the result of his injuries, and the Court – after listening to the testimony and reviewing the transcript of the trial – is similarly unable to locate any such evidence").

Plan. Nor is defendant correct that if plaintiff's decline in production was attributable, not to the Plan itself, but to a "dysthymic disorder," which in turn resulted from plaintiff's placement on the Plan, she could only recover for such harm through an emotional distress damages award and not an economic damages award. (Def. Reply 13.) Both forms of damages are separately compensable where the emotional distress caused by the discriminatory conduct also damaged plaintiff's earning capacity. It is well settled that an economic damages award should "restore[]" the victims of discrimination "to a position where they would have been were it not for the unlawful discrimination." Albemarle, 422 U.S. at 321. The jury was entitled to find that, had Chandler not placed plaintiff on a business development plan, she would neither have suffered emotional distress in 2002, nor would she have experienced a decline in production and income.

2.    Post-Employment Economic Damages

Accordingly, plaintiff was entitled to back pay for the economic harm she incurred while on the Plan. However, it is undisputed that the economic damages award in this case – $500,000 – exceeded any reasonable calculation of her economic damages while she was on the Plan. Indeed, plaintiff effectively concedes that only $45,000 of that award could reasonably be attributed to the decline in her production during 2002. (See Pl. Mem. 18-19.) Presumably, the jury attributed the remaining $455,000 to economic harm plaintiff incurred after her employment ended.[14] However, the jury could not properly have awarded plaintiff post-employment damages

---

[14] The only other "plausible explanation" for the $500,000 economic damages award in this case is that the jurors settled on this amount "by means of an illegitimate compromise verdict, meaning that 'jurors with different views on whether defendant was liable' compromised by agreeing" not to find liability on the discriminatory discharge claim, "but also to award" excessive damages on the claim that plaintiff's placement on the Plan was discriminatory. Exodus Partners, 2007 WL 120053, at *15, quoting Fox v. City Univ. of N.Y., 187 F.R.D. 83, 93 (S.D.N.Y. 1999). However, such "illegitimate compromise" damages awards are prohibited

on the record in this case, nor could the jury have reasonably determined such damages based on the evidence adduced at trial.[15]  Thus, plaintiff's damages award will be remitted to $45,000, compensating plaintiff only for the economic harm she suffered as a direct result of being placed on the Plan.

### a.     Mitigation of Damages

Defendant argues that, because the jury found that plaintiff was not illegally fired on account of her sex, as a matter of law plaintiff can recover only economic damages suffered during the six months that she was on the Plan, and that any economic losses she incurred after her employment ended are not compensable.  In contrast, plaintiff claims that the jury was permitted to award her post-employment damages even though it found that she was not discriminatorily terminated, because, "but for" defendant's prior discriminatory conduct, her employment would not have ended.  (Pl. Mem. 21, citing Saulpaugh, 4 F.3d at 145.)  Accordingly, the relevant question is whether (and if so under what circumstances) a plaintiff who has been subjected to discriminatory conditions on the job, and thereafter either is terminated for lawful reasons or resigns her employment, may nevertheless receive post-

---

under both New York and federal law.  Id. at *15-16 (citing cases).  Thus, the relevant inquiry remains whether the evidence has "provided any reasonable basis for the amount awarded."  Id. at *15.

[15] This was not the fault of the jury.  Neither party requested an instruction specifically advising the jury as to the extent of permissible damages if they found liability only with respect to putting Tse on the Plan but not with respect to the termination of her employment.  At trial, plaintiff argued that both actions were discriminatory, and defendants that neither was.  Neither side appears to have anticipated the possibility that the jury would find liability only as to the earlier action.  Thus, the primary focus of the parties' presentations on damages was on the plaintiff's claims of post-employment losses.  Neither party, nor the Court, addressed the jury regarding how if at all those losses could be linked to plaintiff's placement on the Plan, if the actual loss of plaintiff's employment was found not to result from unlawful discrimination.

employment economic damages.

The Second Circuit has not yet addressed this issue.  Brady v. Wal-Mart Stores, Inc., No. CV 03-3843, 2005 WL 1521407, at *6 (S.D.N.Y. June 21, 2005).  However, other circuits have done so, as have several district courts within this Circuit.  See Townsend v. Exch. Ins. Co., 196 F. Supp. 2d 300, 308-10 (W.D.N.Y. 2002) (surveying relevant case law).  The prevailing view of the appellate courts that have addressed the issue is that "in order for an employee to recover back pay for lost wages beyond the date of his [employment], the evidence must establish that the employer constructively discharged the employee."  Jurgens v. EEOC, 903 F.2d 386, 389 (5th Cir. 1990).  See also Maney v. Brinkley Mun. Waterworks & Sewer Dep't, 802 F.2d 1073, 1075 (8th Cir. 1986); Derr v. Gulf Oil Corp., 796 F.2d 340, 342 (10th Cir. 1986); Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 65-66 & n.8 (5th Cir. 1980); Muller v. U.S. Steel Co., 509 F.2d 923, 930 (10th Cir. 1975).  The Fifth Circuit's decision in Jurgens well illustrates the concerns of courts adopting this rule.

The plaintiffs in Jurgens established that the defendant EEOC had engaged in a pattern or practice of discrimination in making promotions.  Gordon, one of the plaintiffs, was denied a promotion because of his ethnicity, and remained in a lower-ranking position.  A few years later, however, that position was slated for elimination due to a non-discriminatory reorganization and reduction in force.  Gordon was offered the choice of accepting demotion to a still lower position, or taking early retirement.  903 F.3d at 388.  He took the latter course, and later argued that the damages for the discriminatory refusal of promotion he had suffered should include back pay for the period after his retirement, on the ground that "'but for' the EEOC's discriminatory denial of his promotion . . . in 1975, he would not have been compelled to retire in 1979."  Id. at

389.

The Fifth Circuit rejected the argument, concluding that at least in cases of discriminatory failures to promote, "the employee's duty to mitigate damages encompasses remaining on the job." Id. This duty, "rooted in an ancient principle of law," Ford Motor Co. v. EEOC, 458 U.S. 219, 231 (1982), requires an employee to minimize, where possible, the damages caused by discrimination by accepting suitable alternative employment. If the losses due to the discrimination experienced by an employee would be reduced by staying on the job, the employee is required to do that, and may not quit and attribute the damages from quitting to the earlier discrimination on the job. This principle gains special support, the Fifth Circuit has noted, in the specific context of employment discrimination law: "[B]ecause Title VII itself accords legal protection to employees who oppose unlawful discrimination . . . , we believe that society and the policies underlying Title VII will be best served if, whenever possible, unlawful discrimination is attacked within the context of existing employment relationships." Bourque, 617 F.2d at 66.[16] Of course, where there *is* a constructive discharge, that is, where the discriminatory conditions of employment are "so intolerable that the employee is forced into an involuntary resignation," Morris v. Schroder Capital Mgmt. Int'l, 481 F.3d 86, 88 (2d Cir. 2007), the damage stemming from the loss of employment results directly from the discriminatory conduct, and may be compensated.

---

[16] While the Second Circuit has not directly addressed the particular circumstance of an employee whose employment terminates for non-discriminatory reasons at some point after she was harmed by discrimination on the job, it has recognized that federal anti-discrimination law embodies "a premeditated policy choice to encourage employees to stay in the employment relationship as long as possible and try to work out their discrimination claims within the work setting and through administrative processes," quoting with approval district court recitations of that principle. Morris v. Schroder Capital Mgmt. Int'l, 445 F.3d 525, 531 (2d Cir. 2006).

Other courts, however, have identified exceptions to this seemingly firm rule against post-termination damages absent actual or constructive discriminatory discharge. In <u>Wells v. North Carolina Bd. of Alcohol Control</u>, 714 F.2d 340, 342 (4th Cir. 1983), the court affirmed an award of post-termination damages, without a finding of constructive discharge, where the employee wrongfully denied a promotion later developed a disabling condition that prevented his remaining in his original job classification. Similarly, the Ninth Circuit has refused to apply the constructive discharge rule in a case where the plaintiff, a civilian clerk-typist employed by a police department, was denied appointment as a police officer because of her sex. <u>Thorne v. City of El Segundo</u>, 802 F.2d 1131 (9th Cir. 1986). The court endorsed the rule as a general principle:

> The purposes of Title VII are best served when parties, *where possible*, attack discrimination within the context of their existing employment relationships. An employee, faced with an obstacle in the logical progression and development of a career, should not quit at the first sign of institutional discrimination. Restricting backpay awards encourages the employee to work with supervisors in the existing job setting and employment relationship in an effort to overcome resistance within that workplace and to eradicate discrimination.

<u>Id</u>. at 1134 (citations omitted; emphasis in original). The court noted, however, that the plaintiff there was not simply discriminated against in her existing job or denied a promotion. Rather, she was denied entrance to an entirely different career as a police officer. She was thus situated no differently from any other job applicant discriminatorily refused employment: "The mere fortuity that Thorne had a preexisting employment relationship with the employer who was then hiring police officers does not bring her case within the scope of promotion or demotion cases that apply the doctrine of constructive discharge." <u>Id</u>.

These exceptions and distinctions do not necessarily reflect different underlying theories regarding the proper scope of compensation of victims of discrimination, but may simply reflect the fact-specific nature of back pay determinations: "Because the termination date for backpay awards in Title VII cases is peculiarly dependent upon each case's unique facts, . . . courts do not apply the backpay limitation rotely." Thorne, 802 F.2d at 1136 n.4 (citation omitted). The appellate cases finding exceptions to the back pay restriction do not dispute the general, well-established principle that an employee may not receive back pay damages where she could have mitigated her economic harm. Id. at 1136 (finding the "relevant inquiry" to be "mitigation of damages"). All of these cases appear to agree that a Title VII plaintiff is not entitled to back pay damages where she could have mitigated those damages through her own conduct, either because she could have remained in her job while "attacking" the prior conduct, or because remaining in the job after the discriminatory act occurred would not have caused her further economic harm.

In this case, that principle strongly suggests that Tse is not entitled to back pay extending beyond her January 2003 termination date. Under the strong version of the "constructive discharge" rule, plaintiff would simply be barred as a matter of law from recovering post-employment damages. The discrimination that Tse suffered did not amount to a constructive discharge. Indeed, Tse did not even assert a claim of constructive discharge at any time during this litigation.[17] Tse clearly could have mitigated her damages by remaining on the job.

_____

[17] As defendant notes, asserting such a claim would have undermined Tse's consistent position that she never voluntarily resigned her employment, but instead was discriminatorily discharged. See, e.g., Meder v. City of New York, No. 05 Civ. 919, 2007 WL 1231626, at *5 (E.D.N.Y. Apr. 27, 2007) ("The constructive discharge doctrine permits the employee to recharacterize an ostensibly voluntary resignation.")

Although the jury was not asked to decide whether Tse quit or was fired for job abandonment, it concluded that she was not terminated for discriminatory reasons. Any remaining ambiguity makes little difference to the mitigation issue: whether Tse deliberately resigned or simply stopped coming to work, her loss of employment was found by the jury to be the result of her own effective abandonment of the job. Such actions are inconsistent with mitigation. Had Tse not abandoned her job or voluntarily resigned, she could have "attacked" the prior discrimination from within the employment relationship.[18]

Some courts have permitted awards of back pay absent mitigation where "recognized opportunities for career advancement are closed off by reason of [the employer's] discrimination," Townsend, 196 F. Supp. 2d at 309, but such circumstances were not established by plaintiff here. Although plaintiff was economically harmed by being placed on the Plan, she nevertheless might have mitigated her damages by continuing to work at UBS after the Plan ended on December 1, 2002, or by not walking away from her job at that time. The evidence adduced at trial established that, even after plaintiff failed to comply with the terms of the Plan, UBS did not immediately terminate her employment, nor did it even renew the terms of the Plan. Chandler met with Tse twice after the term of the Plan ended; it is undisputed that during those meetings Tse told Chandler that she fully intended to remain in her job and improve her

_____

[18] Indeed, it is undisputed that plaintiff had begun that attack before the Plan even ended by filing an internal grievance with UBS on November 8, 2002, as well as a complaint with the New York State Division of Human Rights on November 13, 2002. (Tr. 758.) There is no indication that defendant would not have investigated plaintiff's discrimination complaint; in fact, the evidence adduced at trial shows that defendant was indeed taking her complaints seriously. (Pl. Ex. 38 (stating that UBS's counsel recommended against terminating plaintiff while a discrimination investigation was pending); Tr. 758-60.) Even if defendant itself had not addressed her concerns, her remedies through the administrative and litigation processes remained available, and could have been pursued without leaving her job.

performance, and that Chandler did not object to her remaining in her job despite her failure to comply with the terms of the Plan. Tse was not fired until almost two months after the Plan ended, after numerous attempts by defendant to contact plaintiff to ascertain the status of her employment, and after it became clear that plaintiff would not return to work. Moreover, it is undisputed that the Plan was only a temporary measure, and that once it was over the terms of plaintiff's employment returned to their pre-Plan state. Thus, the situation here is unlike that presented to the <u>Townsend</u> and <u>Thorne</u> courts, in which the defendant-employer's prior discriminatory conduct effectively placed a permanent "obstacle in the career progression of" the plaintiff-employee's job. <u>Townsend</u>, 196 F. Supp. 2d at 310.

It is impossible in hindsight to determine whether and to what extent plaintiff's income would have increased had she attempted to mitigate her damages by remaining on the job. It is of course possible that, had plaintiff continued coming to work, she would have continued to be hampered to some degree by the residual effects of having been placed on the Plan, or eventually have been terminated unfairly because her production, hobbled by discriminatory conditions, continued to be weak. But plaintiff's decision to take the situation into her own hands – either by voluntarily resigning or by walking away from the job – undermined the goal of anti-discrimination law of encouraging employees to address discriminatory conduct from within the employment relationship while ensuring that employees do not suffer further damage as a result of remaining within that relationship. Plaintiff's abandonment of her job made it impossible to determine to what extent she could have mitigated her damages had she remained on the job without resorting to speculation and guesswork.

If a working environment becomes so intolerable that a reasonable person would feel compelled to terminate her employment, then the plaintiff may assert a cause of action for constructive discharge. If the working environment is not so intolerable that continued employment is impractical, but continued employment nonetheless would not fully compensate plaintiff for the harm incurred due to prior discriminatory activity, then the plaintiff may under some circumstances establish liability for post-employment economic damages. In this case, plaintiff neither asserted a cause of action for constructive discharge, nor showed that she could not remain in the same job after the Plan ended, without further diminution in the terms or conditions of her employment, and thereby "attack" the prior employment discrimination from within the context of the employment relationship. To hold otherwise would at best permit a purely speculative award of damages based on what might have occurred had the plaintiff not abandoned her employment, or at worst allow Title VII plaintiffs to increase rather than mitigate damages by their own actions.[19]

---

[19] Plaintiff relies on two cases from this district as support for her argument that she is entitled to post-employment economic damages here. Nobler v. Beth Israel Med. Ctr., 715 F. Supp. 570 (S.D.N.Y. 1989), is entirely distinguishable. Nobler was discriminatorily denied a promotion. Upon learning he was not promoted, he left for another hospital, where he took a job similar to his previous employment at the same salary. Unlike Tse, Nobler did not seek to hold his prior employer liable for damages resulting from later unemployment; he simply sought compensation for the losses resulting from denial of the promotion. Whether he stayed with the original employer or went elsewhere made no difference to his ability to mitigate damages; the damage from the failure to promote could only be compensated by a back pay award.

In Clarke v. One Source, Inc., No. 99 Civ. 2323 (RPP), 2002 WL 31458238 (S.D.N.Y. Nov. 1, 2002), is more comparable to the present case. Clarke, a building superintendent, was suspended for three days after complaining of race discrimination. Six days later, plaintiff was fired for requesting a recommendation letter from a tenant in hopes of finding a new job, in violation of company rules. At trial, plaintiff claimed that both his suspension and his firing were motivated by unlawful retaliation. The jury found defendant liable for the suspension, but found that the firing was not retaliatory. Id. at *1. Defendant moved to reduce the back pay award to reflect only "the actual loss of pay arising from [plaintiff's] missed three days of work

Accordingly, the economic damages award will be reduced to $45,000, to reflect the maximum amount of economic damages that the jury reasonably could have found plaintiff incurred during her placement on the Plan.[20]

### b. The Damages Chart

Thus, plaintiff was not entitled to post-employment economic damages in this case as a matter of law. However, even if plaintiff could receive such damages, a new trial would be required because on the record in this case the jury could not have reasonably quantified those

---

relating to the suspension," arguing that "[p]laintiff's own misconduct following his suspension by violating the company rule about approaching tenants was an intervening factor resulting in [p]laintiff's termination." Id. at *5. The court rejected defendant's argument, finding that "but for the improper suspension by [d]efendant of [p]laintiff in violation of Title VII, [p]laintiff would not have solicited a work recommendation from a tenant and would not have been lawfully terminated." Id. In Clarke, unlike this case, plaintiff did not walk away from his job, and was fired so soon after the discriminatory action that he had little opportunity to remain on the job either to mitigate his damages or to attempt to resolve his discrimination complaints within the context of the employment relationship. But to the extent the case cannot fairly be distinguished, this Court is unpersuaded by its reasoning, which may have been strained by the extremely sympathetic facts, in which the damages awarded were small and the plaintiff's firing was based on a less than compelling reason.

[20] Plaintiff also argues that a remittitur of her economic damages is inconsistent with the Court's remarks directly following the jury's verdict. (Pl. Mem. 20-21.) To the extent that the Court's contemporaneous remarks on the issue are even relevant at this stage in the litigation, plaintiff's argument is based on selective and misleading quotation. The Court made absolutely clear that it was not "making any definitive ruling" (Tr. 1435), articulated the view that the jury's liability finding was reasonable, and then noted that "[s]ince neither side anticipated or advocated" the jury's liability conclusion, "neither side presented the jury with any specific analysis of how they might go about deciding damages" if they found discrimination only with respect to the business development plan, but not with respect to Tse's termination. (Id. 1437.) The Court sketched possible theories of damages, only to conclude that the issue would require further thought: "I don't know how you [would determine damages]. . . . Ms. Tse suffered some damage . . . including lesser economic performance while she was there. And then the question would be: Can the jury also somehow attribute some future loss of income to the chain of events. Now, that's something I think the parties will need to address if there is future litigation of these issues." (Id. 1437-38.) The Court, in other words, simply noted the existence of the issue and invited the parties to address it in post-trial motions.

damages. Although a jury verdict "need not reflect mathematical precision," Exodus Partners, 2007 WL 120053, at *14, as discussed above, it is also well settled that a jury award that is "overly speculative" may be vacated by the court on a Rule 50 motion, see Cruz, 34 F.3d at 1156. "A plaintiff is not permitted to throw [her]self on the generosity of the jury. If [s]he wants damages, [s]he must prove them." Bracey, 368 F.3d at 119. Here, the amount of post-employment economic damages requested by plaintiff was based on such speculative and unreliable evidence as to render any post-employment damages award in this case invalid.

Plaintiff requested approximately $1.65 million in post-employment economic damages. Plaintiff's principal documentary evidence supporting that request was a chart she herself had prepared, which she claimed accurately summarized those damages. However, that chart (and indeed the details of plaintiff's damages calculations) had never been disclosed to defendant. Moreover, as the Court noted during trial and as plaintiff's counsel conceded during summation (Tr. 1365 ("apologiz[ing]" to the jury for plaintiff's erroneous calculation of her economic damages), the chart itself was "remarkably misleading" (Tr. 1304), and grossly overstated and misrepresented plaintiff's true income while at UBS.

The sudden appearance of plaintiff's distorted exhibit presented the Court with a dilemma. On the one hand, as the chart was previously undisclosed and on its face included confusing and inaccurate calculations, its use could be expected to prejudice defendant. On the other hand, to exclude plaintiff's damage calculation would prevent plaintiff from proving any damages at all on her claim of wrongful termination. Since it was very likely that plaintiff did in fact suffer economic losses as a result of leaving UBS, had the jury found that she was fired as a result of unlawful sex or race discrimination, but been precluded by an evidentiary ruling from

42

finding any damages, justice would not have been done. Seeking to avoid a mistrial or an unjust outcome, the Court chose to permit plaintiff to utilize her chart and explain her calculations, and to trust to cross-examination to clarify the errors in plaintiff's assertions.[21]  But the Court warned that the issue might need to be revisited after trial:

> The damage calculation that was presented to the jury by the plaintiff, in my estimation, is remarkable misleading. . . . I suspect that it is so misleading that if there is a verdict for the plaintiff in any amount that looks like the amount on this chart, I would have to seriously consider any new trial motion that was made on the grounds that information was presented to the jury that is just plain inaccurate. . . . [T]here's a strong possibility that any damage number would be infected by this, and it's something that I would definitely have to revisit if there is a motion made following a plaintiff's verdict. . . . [T]his is one of those rare examples where, with respect to numbers, I don't have confidence that the jury has a fair picture in front of them.

(Tr. 1304-06.)

It is unnecessary here to detail all of the reasons why the chart was misleading; it is merely sufficient to note three significant errors in the chart.  First, plaintiff based her median salary calculation on her W-2s while she was employed at UBS (with the exception of her 2002 W-2, which plaintiff regarded as – and the jury reasonably found to be – artificially depressed due to her placement on the Plan).  However, as plaintiff conceded at trial, part of the W-2 earnings included income properly attributed to forgiveness of her five-year employee forgivable loan, a difference of approximately $50,000 per year, or $600,000 over the 12 years included on

---

[21] Moreover, the Court assumed that the issue would be mooted if the jury rejected plaintiff's principal claim of discriminatory termination – as indeed it did.  Like the parties, the Court did not anticipate the possibility that the trial would not be fully resolved based on the jury's views on this issue, but that the jury would find discrimination only in the subsidiary action of placing plaintiff temporarily on the business development plan.

the chart. (Pl. Mem. 24; id. 27 n.12; Tr. 1264; Def. Ex. 77.) These amounts therefore resulted from a non-recurring "signing bonus," and did not reflect actual earnings that could be expected to continue had Tse remained at UBS. Second, plaintiff similarly improperly included a one-time length of service bonus into her post-employment economic damages. (Pl. Mem. 27.) Third, plaintiff improperly failed to account for certain one-time exercises of stock options, thereby double-counting those amounts in her post-employment economic damages calculation; in 2001 alone, this error amounted to an overestimation of her earnings by $21,334.34. (Def. Reply Mem. 23 n.12; see Def. Ex. 77.)

These were not the only errors in plaintiff's economic damages chart. (See Def. Mem. 24; see, e.g., Pl. Mem. 27 n.12 (noting an additional error that defendant failed to consider in its post-trial brief).) Although several of the errors might have been "relatively minor" (Pl. Mem. 27), the aggregate consequence of all of the errors rendered the chart totally misleading, as well as extremely difficult to follow.[22] Thus, the chart undermined the jury's ability to "ascertain what portions of" plaintiff's economic damages request were valid, and which were improper. Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998).

Ordinarily, our system of justice relies on the adversarial process of cross-examination and the submission of contrasting evidence by the opposing party to ferret out false or misleading testimony. But that process only works effectively if the rules of discovery that permit an adversary an adequate opportunity to prepare are scrupulously followed. Here,

---

[22] Indeed, plaintiff conceded at trial that even she did not understand the evidence underlying her own chart; when asked about the components of her purported W-2 income on which she relied to compute her post-employment damages, she responded, "I'm not an expert." (Tr. 1264.)

defendant's opportunity to rebut plaintiff's misleading evidence was gravely handicapped by plaintiff's failure to disclose her calculations in advance of trial. Under Rule 26(a)(1)(C), Fed. R. Civ. P., plaintiff was required to disclose her damage calculation as part of her initial disclosures at the outset of the case. Where a party "without substantial justification fails to disclose information required by Rule 26(a)," she "is not, unless such failure is harmless, permitted to use as evidence at trial" the information not disclosed. Rule 37(c), Fed. R. Civ. P. The sanction of exclusion is "near automatic," Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 20 (1st Cir. 2001), quoted with approval in Design Strategy, Inc. v. Davis, 469 F.3d 284, 297 (2d Cir. 2006).

It cannot be concluded that the error here was harmless. Had the plaintiff properly disclosed the calculation and chart before trial, let alone during discovery, the chart almost certainly would not have been presented to the jury in the form that it was. The errors and overstatements in the chart would likely have been uncovered during plaintiff's deposition, and a modified, more accurate calculation would likely have been produced. Moreover, defendant would surely have moved in limine for the exclusion of the chart, as it promptly did when the chart was first offered (Tr. 304), again likely leading to a refinement of the exhibit and the presentation of a very different damages demand by plaintiff.

Plaintiff argues that, even if the chart was so misleading as to render any economic damages number based on the chart inherently erroneous, the cross-examination of Tse cured those defects, as reflected by the fact that the jury awarded plaintiff only approximately one-third of her requested post-employment economic damages. (Pl. Mem. 28.) According to plaintiff, the reduced award reflected the jury's "deep discounts from the economic damages claimed in

[plaintiff's] chart" (id.), and shows that the jury calculated its award, not based on the damages chart, but based on other evidence in the record. In the first place, this argument discounts the realities of trial. Defendant was required to cross-examine on the fly, without adequate preparation; defendant's presentation to the jury would likely have been far more effective with adequate disclosure. Moreover, the details of the plaintiff's calculations, the complex relationship between the imputed income reflected on the W-2 and plaintiff's actual earnings, and arguments over the estimated value of fringe benefits and the possibility of double-counting of various amounts, were highly arcane and confusing. Under the circumstances, there is a significant likelihood that the jury's "discounting" reflected some speculative slashing of an opening bid by plaintiff that should never have been on the table, rather than a rational estimate of damages informed by the actual evidence. Finally, the jury's decision to award less than the damages requested may well have reflected a conclusion that not all of plaintiff's post-employment loss was attributable to being placed on the Plan, rather than a rejection of plaintiff's calculation of the extent of that loss. It is thus impossible to disentangle the consequences of plaintiff's failure to make appropriate discovery.

In any event, even taking plaintiff's argument on its own terms, the relevant inquiry is whether plaintiff presented the jury with any other credible evidence by which it could reasonably ascertain her post-employment economic damages. Upon searching examination of the testimony and record in this case, the Court finds that there was no other reasonable basis upon which the jury reasonably could have determined plaintiff's post-employment economic damages. Although plaintiff did submit some of her pre- and post-employment W-2s and tax returns (Tr. 304), as previously noted, those documents themselves were potentially confusing

insofar as they significantly overestimated plaintiff's actual annual earned income, and thus her post-employment damages. Therefore, the jury was relegated to estimating plaintiff's post-employment damages by comparing misleading documentary evidence with significantly confusing and complicated examination and cross-examination on the issue. (See Tr. 305 (noting that the jurors eyes were "glazing over" during the cross-examination of plaintiff on her post-employment economic damages).)

Plaintiff relies primarily on that cross-examination to cure her defective damages chart, but it is plaintiff's burden to present a non-speculative basis for determining economic damages. That burden is not met where plaintiff's evidence consisted of her own misleading testimony, especially where that testimony is directly contradicted by her documentary evidence. See, e.g., Wang v. Yum! Brands, Inc., No. 05-CV-1783, 2007 WL 1521496, at *6 (E.D.N.Y. May 22, 2007) (precluding plaintiffs from offering evidence on the issue of economic damages where "plaintiffs' sole evidence as to the amount of . . . lost wages [was] . . . unsubstantiated testimony"). Cf. Del Valle v. White Castle Sys., Inc., 715 N.Y.S.2d 57, 57 (1st Dep't 2000) (vacating jury award of damages for lost wages based solely on plaintiff's testimony); Nelson v. 1683 Unico, Inc., 668 N.Y.S.2d 375, 376 (1st Dep't 1998) ("[The] plaintiff's testimony . . . without supporting documentation failed to establish loss of any actual past earnings."). This combination was fatal to plaintiff's post-employment economic damages request, regardless of how much of her requested damages was awarded by the jury. See Kramer v. Showa Denko K.K., 929 F. Supp. 733, 743 (S.D.N.Y. 1996) ("The basic rule is that loss of earnings must be established with reasonable certainty . . . ."). (See Tr. 1306 (noting that "this is one of those rare examples where, with respect to the numbers, [the Court doesn't] have confidence that the jury

47

has a fair picture [of plaintiff's post-employment economic damages] in front of them").)[23]

Accordingly, to whatever extent plaintiff might have been entitled to recover for post-employment economic losses arguably attributable in some fashion to the pre-termination discrimination she experienced, her failure to prove her post-employment economic damages with any degree of reasonable certainty at trial, and the presentation of misleading and non-disclosed evidence, fatally infected any possibility that the jury could have adequately calculated any such damages. A new trial on damages would therefore be required in any event.

## IV. Punitive Damages

Defendant next argues that the $3,000,000 punitive damages award should be vacated. Specifically, defendant argues (1) that plaintiff failed to show that defendant "acted with malice or reckless disregard of plaintiff's rights . . . or engaged in any egregious or outrageous conduct" (Def. Mem. 30), and (2) that the punitive damages award was grossly excessive. Although plaintiff may recover punitive damages because the jury could reasonably have found that defendant acted with "reckless disregard of plaintiff's rights," the amount of the award in this case far exceeds any discernable reprehensibility and is therefore excessive. The punitive damages award will be remitted to $300,000.

---

[23] Plaintiff also argues that the erroneous and misleading information included in the chart was cured by Chandler's testimony and by defendant's submission of an exhibit "in refutation of [plaintiff's] damages calculation." (Pl. Mem. 28, citing Def. Ex. 77.) But again, it was plaintiff's burden to prove those damages with reasonable certainty in the first instance. Although defendant might have succeeded in showing that plaintiff's damages calculation was erroneous, plaintiff did not then submit any evidence by which the jury could have reasonably calculated her post-employment damages after those errors were revealed.

A.      Malice or Reckless Disregard

First, the Court must consider whether, based on the evidence at trial, the jury reasonably found that plaintiff is entitled to any punitive damages at all.  In order to award punitive damages under either the CHRL or Title VII,[24] a jury must find by a preponderance of the evidence that a defendant's conduct is not only actionable, but also exhibits either "malice" or a "reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1); see Farias v. Instructional Sys., Inc. 259 F.3d 91, 101-02 (noting that the same standard applies to claims for punitive damages under both Title VII and the CHRL).  These standards "require, for an award of punitive damages, that a defendant not only intentionally discriminate but do so in the face of a perceived risk that these actions are prohibited by law." Id. at 102.  See Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 529-30 (1999).

While "[e]gregious or outrageous acts may serve as evidence supporting the [requisite intent]," Robinson v. Instructional Sys., Inc., 80 F. Supp. 2d 203, 210 (S.D.N.Y. 2000), quoting Kolstad, 527 U.S. at 538, a plaintiff need not show such acts in order to recover punitive damages.  See Payne v. Mount Hope Housing Co., No. 04 CV 2897, 2007 WL 900034, at *3 (E.D.N.Y. Mar. 25, 2007), citing Cush-Crawford v. Adchem Corp., 271 F.3d 352, 356 (2d Cir. 2001), quoting in turn Kolstad, 527 U.S. at 538.  In order to recover punitive damages, plaintiff must prove only that the employer intentionally acted with the knowledge that it may be acting "in violation of" the law, even if it did not know it was "engaging in discrimination."  Farias, 259 F.3d at 101 (internal quotation marks and citation omitted).  Evidence that the employer was

---

[24] Punitive damages are not awardable under the SHRL.  See Thoreson v. Penthouse, Int'l, Ltd., 80 N.Y.2d 490, 494 (1992)

generally familiar with anti-discrimination law when it committed the discriminatory act is sufficient to permit the inference that it acted with the requisite state of mind to justify an award of punitive damages. See Zimmerman, 251 F.3d at 385 (finding that supervisor's training in equal employment opportunity permitted the jury to infer the requisite state of mind); Parrish v. Sollecito, 280 F. Supp. 2d 145, 152-53 (S.D.N.Y. 2003).

It is undisputed that Tse was intentionally placed on the Plan. Thus, the remaining inquiry is whether the jury reasonably could have found that Chandler acted with the intent required to justify a punitive damages award, that is, that he placed Tse on the Plan either out of malice or in reckless disregard of plaintiff's rights. Although plaintiff submitted scant evidence that Chandler acted out of malice, see Part IV.B, infra, the evidence was sufficient for the jury reasonably to conclude that he acted with reckless disregard for plaintiff's rights. Plaintiff presented direct evidence of Chandler's awareness of Title VII's requirements. Chandler testified that it was "common knowledge" that an employer could not retaliate against an employee for filing a discrimination complaint (Tr. 759), and that he knew the importance of assessing employees in non-discriminatory performance appraisals (id. 704). In addition, UBS distributed to all employees its Code of Conduct, which states, "[a]ll employment policies, procedures and actions must be applied in a non-discriminatory manner." (Def. Ex. 61 at 25.) "[G]eneral training in equal opportunity protocol and hiring practices is sufficient to infer awareness of Title VII requirements," Parrish, 280 F. Supp. 2d at 152-53, and thus permits a jury to infer reckless disregard of those rights when they are violated. Thus, the jury reasonably found that Chandler acted with the requisite intent, and plaintiff was entitled to punitive damages here.

Defendant attempts to heighten the showing required for a punitive damages award by arguing that plaintiff was required to establish at trial, not just that Chandler knew the general tenets of anti-discrimination law, but that Chandler knew specifically that the discriminatory placement of an employee on a business development plan could violate the employee's rights. This heightened standard is unsupported by the case law,[25] would subject Title VII plaintiffs to an overly onerous evidentiary burden,[26] and would blur the line between reckless indifference to whether the employer "may be acting in violation of federal law," which is required, and certain knowledge that the employer "is engaging in discrimination," which is not.  See Kolstad, 527 U.S. at 535.

Defendant next argues that Chandler did not engage in any malicious or reckless conduct because the Plan did not violate plaintiff's rights, and specifically, because the Plan was merely a "reasonable" business decision by Chandler that was just a form of "constructive coaching." (Def. Mem. 31-32.)  This is merely a rehash of defendant's argument that the Plan was not an adverse employment action, and as previously established, is not supported by the record.

Finally, defendant argues that, even assuming the Plan did have negative consequences for plaintiff's employment, it was not an "egregious" or "malicious" violation of her rights for various reasons, including that the Plan itself was "based on a template provided to Chandler by

---

[25] See Hill v. Airborne Freight Corp., 212 F. Supp. 2d 59, 76 (E.D.N.Y. 2003) (holding jury could reasonably infer that defendant's managers knew their actions violated federal law by virtue of well-established Supreme Court case law on discrimination, long standing statutory prohibition against such conduct, the company's size, and "the common knowledge in today's society that employment discrimination is impermissible").

[26] See Parrish, 280 F. Supp. 2d at 152 ("Direct evidence that an employer acted with knowledge that the [discriminatory act] found by a jury violated federal law is not necessary to prove the requisite state of mind of the employer to justify an award of punitive damages.").

[defendant's] legal department," and that plaintiff's counsel "conceded that Chandler did not . . . engage in any egregious or outrageous conduct" when he pointed to Chandler during his summation and stated, "I am not saying that this man is evil or anything like that." (Id. 32, quoting Tr. 1340.) Even assuming arguendo that the facts weigh against a finding that Chandler acted with a malicious intent or that the Plan itself was an egregious violation of plaintiff's rights, plaintiff was not required to show that Chandler acted maliciously or egregiously in order to recover punitive damages. Instead, plaintiff was only required to show that Chandler acted intentionally and with reckless indifference to the perceived risk that his actions might violate the law. Because the jury could reasonably have found that plaintiff made that showing, its decision to award punitive damages may not be disturbed.

### B. Excessiveness

Next, the Court must determine whether the punitive damages award in this case was excessive. Punitive damages must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21 (1991). An award of punitive damages should be reversed only if it is "so high as to shock the judicial conscience and constitute a denial of justice." Hughes v. Patrolmen's Benevolent Ass'n, 850 F.2d 876, 883 (2d Cir. 1988), quoting Zarcone v. Perry, 572 F.2d 52, 56-57 (2d Cir. 1978). In BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), the Supreme Court identified three "guideposts" for determining whether a punitive damage award is excessive: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm and the punitive damages award, or in other words, the proportion or ratio of punitive damages to compensatory damages; and (3) the difference

between the remedy and the civil penalties authorized or imposed in comparable cases.  Id. at 574-75.

As an initial matter, plaintiff argues that Gore is not controlling here because the bulk of the punitive damages award is attributable, not to Title VII, but to the CHRL.  The jury awarded $3 million in punitive damages; however, Title VII imposes a $300,000 cap on compensatory and punitive damages for employers as large as UBS.  See 42 U.S.C. § 1981a(b)(3)(D).  As a result, only $244,000 of the punitive damages award may be attributed to plaintiff's Title VII claim,[27] and the remainder of the award must be attributed to plaintiff's CHRL claim.  Thus, plaintiff argues that Gore is inapposite, and New York law governs the determination of whether her punitive damages were excessive.  (Pl. Mem. 39, citing Greenbaum v. Handelsbanken, NY, 67 F. Supp. 2d 228 (S.D.N.Y. 1999).)

Plaintiff completely misapprehends Gore.  Gore is not a Title VII case, nor did it arise under federal law.  Rather, it was a state common-law tort case arising under the law of Alabama.  The limitations on punitive damages announced by the Supreme Court in Gore were based on the federal constitutional requirement of due process of law.  Punitive damages under New York law must comport with those federal constitutional requirements, which "prohibit[] a State from imposing a 'grossly excessive' punishment on a tortfeasor."  Gore, 517 U.S. at 562 (citation omitted).  Thus, Gore is a ceiling for all punitive damages awards: while a state may impose stricter standards on punitive damages than those imposed by Gore, if a punitive damages award does not satisfy the Gore standards, then it cannot be legitimated by state law.

---

[27] Plaintiff's emotional distress award is subject to the cap, but her back pay award is not. See 42 U.S.C. § 1981a(b)(2); Kuper v. Empire Blue Cross & Blue Shield, No. 99 Civ. 1190, 2003 WL 359462, at *11 (S.D.N.Y. Feb. 18, 2003).

Moreover, there is no basis in the case law for plaintiff's argument that the Court should perform two separate punitive damages determinations for plaintiff's CHRL and Title VII claims; indeed, federal courts that have considered punitive damages awards under both Title VII and the CHRL have consistently applied the Gore standards, without reference to New York law, see Thomas v. iStar Fin., Inc., 508 F. Supp. 2d 252 (S.D.N.Y. 2007); Watson v. E.S. Sutton, Inc., No. 02 Civ. 2739, 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005). Even those New York state court cases cited by plaintiff applied the Gore standards to their punitive damages determination. See, e.g., McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc., 682 N.Y.S.2d 167, 169 (1st Dep't 1998). Finally, even if New York law governed this issue, New York courts have recognized that "[i]n analyzing whether to sustain an award of punitive damages under [the CHRL], state courts apply the same framework" as that applied under Title VII, Jordan v. Bates Adver. Holdings, Inc., 816 N.Y.S.2d 310, 322 (N.Y. County Sup. Ct. 2006), and that the standard imposed by New York on punitive damage awards in discrimination cases is "virtually identical" to that imposed by Gore, see Greenbaum, 67 F. Supp. 2d at 262.

Accordingly, the punitive damages award must be analyzed under the Gore standards.

1. Reprehensibility

First, upon independent examination of the evidence adduced at trial, the Court finds that the evidence did not warrant a finding that defendant's discriminatory act was sufficiently reprehensible to justify a $3 million punitive damages award. To assess the degree of reprehensibility of a discriminatory act, consideration should be given to (1) whether the act was violent or presented a threat of violence; (2) whether the act was undertaken with deceit or malice as opposed to mere negligence; and (3) whether defendant has engaged in repeated

54

instances of discriminatory conduct.  Fernandez v. North Shore Orthopedic Surgery & Sports

Med., P.C., 79 F. Supp. 2d 197, 207 (E.D.N.Y. 2000), citing Lee v. Edwards, 101 F.3d 805, 809

(2d Cir. 1996).  See also State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003).

In this case, there is no evidence that defendant's actions were violent or presented a

threat of violence.  Furthermore, there was little evidence that Chandler acted out of malice in

placing plaintiff on the Plan, and no evidence that the discriminatory act was deceitful.  The only

evidence that might reasonably be interpreted as showing a malicious intent was the testimony of

Esdras Vera, a UBS employee based in Puerto Rico, who claimed that Chandler once told him

during a job interview that "th[e Madison Avenue] office is not culturally diversified and

[Chandler didn't] intend to make it culturally diversified."  (Tr. 577-78.)  However, that

statement has limited application here; even assuming that the statement was made, Chandler

was referring to the office's "cultural[]," and not gender, diversity, and the jury specifically

found that plaintiff's placement on the plan was not based on racially discriminatory animus.

Apart from that one statement, plaintiff adduced no direct evidence at trial indicating that

Chandler was motivated by a discriminatory bias in placing her on the Plan; indeed, plaintiff's

entire case was built on indirect evidence of discrimination, which, though sufficient to uphold a

finding of liability, was insufficient to show that Chandler's actions were motivated by a

malicious intent.

Plaintiff also did not adduce evidence that the discriminatory act here was deceitful.

Although the jury found that Chandler treated plaintiff less favorably than he did other low-

producing male FAs, his expectations and intentions were never hidden from plaintiff.  Rather,

Chandler alerted plaintiff to his concerns about her performance several months before the Plan

was instituted. The Plan was instituted openly and did not involve any measure of deceit – plaintiff was even given the opportunity to amend the terms of the Plan before it was instituted.[28]

But most significantly, plaintiff provided no evidence that defendant has engaged in repeated instances of misconduct to other female employees, or towards herself. Indeed, in finding that there was a low degree of reprehensibility in this case, the Court is particularly guided by the jury's finding that plaintiff's termination was not discriminatory, thereby showing that her placement on the Plan was an isolated, discrete event. Moreover, plaintiff presented no evidence showing that any other female FA was placed on a business development plan, or that Chandler discriminated against any other female employee. Indeed, the only other low-producing female FA called by plaintiff, Andreanna Davis, actually testified that Chandler treated her favorably and that she was happy with her employment at UBS. (See Tr. 1081.)[29]

Plaintiff's remaining arguments that defendant's conduct was sufficiently reprehensible to justify a $3 million punitive damages award in this case are inapposite. For example, plaintiff argues that "[c]ourts consistently find intentional discrimination to be reprehensible under Gore."

---

[28] Plaintiff points to Chandler's "lie[s]" at trial as evidence of his deceit in placing her on the Plan. (Pl. Mem. 43-44.) Plaintiff claims that the jury must have found that Chandler lied at trial because it found for plaintiff on one of her claims. But that is an unreasonable interpretation of the record – what plaintiff characterizes as "lie[s]" are more accurately characterized, at most, as prior inconsistent statements. Simply because the jury found plaintiff's testimony more credible than Chandler's does not lead to the conclusion that Chandler committed perjury. Moreover, the relevant inquiry here is whether Chandler was deceitful in placing plaintiff on the Plan, which does not call for an analysis of his credibility at trial on issues which were for the most part unrelated to whether he lied to plaintiff during the course of her employment.

[29] Even if Davis was not an appropriate comparator for plaintiff because Davis wanted to leave her employment whereas plaintiff wanted to stay, the fact that she testified that Chandler did not discriminate against her undermines any claim that Chandler engaged in repeated and continuous discriminatory conduct towards female FAs in the Madison Avenue Branch.

(Pl. Mem. 42.)  The argument is beside the point – in order to determine whether this case

warrants a punitive damages award, the *degree* of reprehensibility must be assessed.

See Kolstad, 527 U.S. at 534; D'Ascoli v. Roura & Melamed, No. 02 Civ. 2684, 2005 WL

1655073, at *2 (S.D.N.Y. July 13, 2005) (noting that Congress established a higher standard that

a plaintiff must satisfy to receive a punitive damages award).

Plaintiff also claims that her placement on the Plan should be considered "reprehensible"

because she is "probably . . . not as trusting" due to Chandler's discriminatory conduct, and that

"there's a lot less joy in [her] life" as a result.  (Pl. Mem. 43, quoting Tr. 340.)  But, although

"punitive damages may duplicate aspects of compensatory recovery included in the same

verdict," TVT Records v. Island Def Jam Music Group, 279 F. Supp. 2d 413, 429 (S.D.N.Y.

2003), plaintiff's testimony about her "distrust" of people is most relevant, not to punitive

damages, but to her emotional distress, for which she received a separate emotional distress

award.  Unlike emotional distress damages, which are intended to compensate plaintiff for

mental and emotional anguish as a result of being placed on the Plan, the goal of punitive

damages is to punish the defendant and to deter future discriminatory conduct.

Finally, plaintiff claims that the sex discrimination at UBS was "flagrant" because most

of the employees were male.  (Pl. Mem. 44, 45 n.17.)  But this evidence has limited utility in

deciding the degree of reprehensibility of the discriminatory act in this case.  The jury did not

find that plaintiff's termination was discriminatory, nor did plaintiff assert a cause of action for

discrimination in any other employment practice at UBS.  Plaintiff offered no evidence of sex

discrimination in hiring at UBS; indeed, she herself had been aggressively recruited by

defendant.  (Tr. 350-57.)  The only discriminatory act in this case was plaintiff's placement on

the Plan. Thus, the jury was only entitled to award an amount that would punish and deter UBS from treating its low-performing female FAs less favorably than its low-performing male FAs. But plaintiff adduced no evidence that her placement on the Plan was part of a larger, systemic discriminatory policy whereby all low-producing female FAs were treated less favorably than all low-producing male FAs, nor any evidence that *any* other female FA, other than herself, was treated discriminatorily.

Thus, the $3 million punitive damages award was not reasonably tailored to the degree of reprehensibility exhibited by defendant's conduct in this case. In awarding punitive damages, juries are required to act within "reasonable constraints" such that the award affords a proper punishment for the particular discriminatory act found in the case. TVT Records, 279 F. Supp. 2d at 429. The "exorbitan[t]" $3 million punitive damages award in this case suggests that the jury's verdict went beyond the need to punish and deter this particular discriminatory act – which was discrete and not motivated by a malicious or "evil" intent – and was influenced by "passion" against discrimination in general. Thomas v. iStar Fin., Inc., No. 05 Civ. 606, – F. Supp. 2d –, 2007 WL 2935640, at *2 (S.D.N.Y. Oct. 4, 2007). "[I]n cases where a punitive award is the product of jury passion, bias or unlimited discretion, that punitive award may embody such an extreme result that it shocks the judicial conscience." Bisignano v. Korff, No. 00 Civ. 5640, 2001 WL 1772172, at *1 (S.D.N.Y. Mar. 21, 2001). Thus, because "the jury's discretion" in this case was "not exercised within reasonable constraints, but [wa]s instead the product of passion or bias, it is the duty of this Court to set aside the award." Id. See Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992) (holding that punitive damages awards may not be "oppressive or patently excessive").

2.      Ratio

The second factor to be assessed is whether the punitive damages award was "proportion[ate]" to the "harm actually incurred" by plaintiff.  In order to make that determination, Gore instructs that the Court should first consider the ratio of the punitive damages award to compensatory damages, including back pay.

In this case, plaintiff was awarded $500,000 in economic damages and $56,000 in emotional distress damages.  However, as previously discussed, the $500,000 economic damages award was improper, and plaintiff was only entitled to $45,000 in economic damages.  Thus, plaintiff's properly-awarded compensatory damages amounted to $101,000.  Accordingly, the $3 million punitive damages award bears approximately a 30:1 ratio to the compensatory damages. See Ortiz-Del Valle v. Nat'l Basketball Ass'n, 42 F. Supp. 2d 334, 345 (S.D.N.Y. 1999) (comparing punitive damages award to remitted compensatory damages award); Kim v. Dial Serv. Int'l, Inc., No. 96 Civ. 3327, 1997 WL 458783, at *15 (S.D.N.Y. Aug. 11, 1997) (noting that it is appropriate to measure punitive damages against the "far smaller figure" for compensatory damages after remittitur).

The ratio of punitive damages to compensatory damages in this case is clearly excessive. Although "low awards of compensatory damages may properly support a higher ratio than high compensatory awards," State Farm, 538 U.S. at 425, such a result is only proper if the act that caused the low amount of economic damages was "particularly egregious" or malicious.  Gore, 517 U.S. at 582.  As previously established, the discriminatory conduct in this case was not egregious or malicious.  Moreover, "[i]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process . . .

59

[and] an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." State Farm, 538 U.S. at 406. See also Phillip Morris USA v. Williams, 127 S.Ct. 1057, 1061-62 (2007) (noting that the longstanding practice of setting punitive damages at two, three or four times the compensatory damage is instructive and serves as guidance as to whether a punitive damage award is grossly excessive); Gore, 517 U.S. at 581 (noting that a punitive damage award of more than four times the amount of compensatory damages "might be close to the line" of excessiveness) (internal quotation marks omitted). See, e.g., Cioffi v. N.Y. Cmty. Bank, 465 F. Supp. 2d 202, 215 (E.D.N.Y. 2006) (upholding punitive damages award based on jury's finding of sexual harassment and retaliation because ratio between punitive and compensatory damages was less than 2:1); Lamberson v. Six West Retail Acquisition, Inc., No. 98 Civ. 8053, 2002 WL 59424, at *7 (S.D.N.Y. Jan. 16, 2002) ($400,000 punitive damages award excessive when compared to compensatory damage award of $15,000; ratio of 27:1 is grossly excessive especially when compensatory damages award is on the high end of what would be reasonable); Ortiz-Del Valle, 42 F. Supp. 2d at 345 ($7 million punitive damages excessive in that it was 55 times the remitted amount of compensatory damages); Iannone v. Frederic R. Harris, Inc., 941 F. Supp. 403, 415 (S.D.N.Y. 1996) ($250,000 punitive damage award excessive when compared to remitted $23,000 compensatory damages award; finding that a 2:1 ratio of punitive to compensatory damages is appropriate where the employer's conduct was serious but not "repugnant" and involved a single incident of discrimination).

3.    Civil Penalties and Comparable Cases

The $3 million punitive damages award was also grossly excessive when compared to punitive damages awards imposed in other employment discrimination cases. Not only do juries

rarely make such exorbitant awards in employment discrimination cases that involve far more egregious actions and systemic discrimination than that in this case, see Rivera v. Baccarat, Inc., 10 F. Supp. 2d 318, 332 (S.D.N.Y. 1998) (remitting a $375,000 award of punitive damages in a Title VII and ADEA termination case to $40,000, after finding that "[b]oth the overt and direct nature of the discrimination and the harshness with which it was manifested . . . justify an award of punitive damages"); Kim, 1997 WL 458783, at *16 (national origin discrimination case in which plaintiff established wrongful termination; remitting punitive damages from $750,000 to $25,000), but even when such large amounts are awarded, they are usually remitted. For example, in Luciano v. Olsten Corp., 110 F.3d 210 (2d Cir. 1997), the Second Circuit affirmed the district court's remittitur of a $5,000,002 punitive damages award to the applicable Title VII statutory cap of $300,000, even though there was "ample evidence to support a finding that [defendant] acted with malice or reckless indifference to [plaintiff's] rights with respect to gender discrimination," including, among other evidence, "testimony . . . that Olsten's Chief EEOC officer and Human Resources Director . . . called [plaintiff] a 'bitch' at an official business function." Id. at 221. See , 2005 WL 2170659, at *18 ("Although jury verdicts in excess of $300,000 occur in New York, only in very few cases can such verdicts . . . be affirmed.").

Indeed, courts have not hesitated to remit much lower amounts where the discriminatory conduct was not sufficiently reprehensible or egregious to warrant the higher amount. See Iannone, 941 F. Supp. at 414 (remitting a $250,000 punitive damages award to $50,000 where the court found that "[t]he defendant's conduct . . . was by no means as reprehensible as that in many other gender discrimination, sex harassment, and retaliation cases"); Ettinger v. State

Univ. of N.Y. State Coll. of Optometry, No. 95 Civ. 9893, 1998 WL 91089, at *11 (S.D.N.Y. Mar. 2, 1998) (remitting a $450,000 punitive damages award to $6,000 where the defendant's "degree of retaliation was not extreme"); Ortiz-Del Valle, 42 F. Supp. 2d at 345 (conditioning denial of new trial on plaintiff accepting reduction of $7 million punitive damages award to $250,000 in gender discrimination action even though there was "evidence from which the jury could have found deceitfulness and a continuing violation"); Lamberson, 2002 WL 59424, at *8 (ordering new trial in retaliatory treatment and discharge action regarding appropriate punitive damages award where jury imposed punitive damages of $250,000 against employer and $125,999 against individual defendant unless plaintiff agreed to a reduction of award to a total of $30,000).

The cases cited by plaintiff in which similarly high punitive damages awards were upheld are inapposite. In those cases, the courts specifically found that the employer's actions were so egregious or significantly reprehensible as to warrant such severe punishment. See Greenbaum, 67 F. Supp. 2d 228 (finding that defendant's conduct was so reprehensible that the $1.25 million punitive damages award was appropriate; defendant had repeatedly refused to promote the plaintiff because of her sex, subjected her to a six-year pattern of discrimination, attempted to hide its adverse actions from plaintiff, and eventually terminated her in retaliation for complaining about discrimination); Watson, 2005 WL 2170659 (remitting a $2.5 million punitive damages award to $717,000, approximately 50% of the compensatory damages award, where defendant systematically failed to take complaints of sexual misconduct seriously, maliciously terminated plaintiff for complaining of sexual harassment, filed false affidavits in response to her EEOC charge, and falsely accused her of committing a federal crime); McIntyre,

682 N.Y.S.2d 167 (remitting $2.5 million punitive damages award to $1.5 million where conduct was so egregious that the jury also returned a verdict for plaintiff on her intentional infliction of emotional distress claim); Jordan, 816 N.Y.S.2d 310 (finding a $500,000 punitive damages award appropriate where defendant, including its President, harassed plaintiff about the use of her cane, knocked over her cane, reduced her responsibilities, turned her office into a storage room, called her a "cripple," and eventually terminated her on account of her perceived disability). Moreover, several of those cases, unlike this one, involved a finding of discriminatory or retaliatory termination. See Greenbaum, 67 F. Supp. 2d 228; Watson, 2005 WL 2170659; Jordan, 816 N.Y.S.2d 310.

Indeed, the number of courts in this Circuit that have either awarded or upheld such a high punitive damages award is so scant that plaintiff is relegated to citing cases from other circuits for support (Pl. Mem. 47-48), but even those cases are inapposite, as they all involved conduct that was much more reprehensible and egregious than that present here. See Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020 (9th Cir. 2003) ($2.6 million punitive damages award was not excessive under Gore factors where, inter alia, plaintiff's manager made derogatory comments about plaintiff's national origin, plaintiff was demoted, excluded from management meetings, taken off the list of managers, denied a contractual bonus, had his car and keys confiscated, publicly terminated, and then denied a severance package given to white employees); Swinton v. Potomac Corp., 270 F.3d 794 (9th Cir. 2001) ($1 million punitive damages award found justified where plaintiff was subjected to daily highly offensive racial harassment, and his supervisor heard the racial slurs and laughed along with them); Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091 (10th Cir. 2001) ($1.1 million punitive damages award

under § 1981 was justified where the court found that the store's racial discrimination was particularly reprehensible where it had "race codes" for customers, tracked African-Americans upon entering the store, highlighted and singled out African-American shoppers as "suspicious," segregated its store incident reports by race, and mentioned race numerous times in its incident reports).

Plaintiff attempts to distinguish her case from the multitude of cases in which similarly high punitive damages awards were remitted post-trial by arguing that "[n]one of [those] cases applied the New York punitive damages standard applicable to this case." (Pl. Mem. 47.) Whatever the underlying cause of action in those cases, however, the courts in each of them reduced the punitive damages award because the award violated due process. Regardless of the outcome under New York law, plaintiff's punitive damages award is subject to the same due process standards. Because the award violates those standards, it must be remitted.

In sum, the award in this case must be reduced so that it is reasonably related to the reprehensibility of defendant's conduct, and so that it is consistent with other punitive damages awards given in similar cases. However, although the reprehensibility of Chandler's conduct was low and does not support a $3 million punitive damages award, the discriminatory act was significantly detrimental to plaintiff's employment in that it placed her in a worse position than similarly low-performing male FAs, and indeed, if such discrimination continued in the future, it could have a substantial effect on the advancement of women at UBS. Although plaintiff did not establish that defendant discriminates against women in terms of hiring, promotion, or termination, it was reasonable for the jury to find that defendant should be punished for, and deterred from, treating its struggling female employees less favorably than its struggling male

employees.  Clearly, where an employer favors one group of poor performing employees over another group, the former will be more likely to progress in the job, and the latter, more likely to fail.  Thus, a reasonable amount of punitive damages is justified in this case to prevent defendant from repeating its discriminatory conduct again in the future, and to ensure that the same standards of employment apply equally to all UBS employees, regardless of gender.

Accordingly, the Court will remit the punitive damages award to $300,000.  This amount is guided in part by the Title VII statutory cap of $300,000.[30]  Although, as previously noted, the CHRL does not impose a cap on damages, courts in the Second Circuit have found that the legislative determination to impose a $300,000 cap on compensatory and punitive damages awards under Title VII reflects that this is a "suitable" amount "to support the objectives of deterrence and punishment" of discriminatory conduct.  Luciano v. Olsten Corp., 912 F. Supp. 663, 672 (E.D.N.Y. 1996).  See Kuper v. Empire Blue Cross & Blue Shield, No. 99 Civ. 1190, 2003 WL 359462, at *10 (S.D.N.Y. Feb. 18, 2003) (same); see also Thomas, 508 F. Supp. 2d at 263 (noting that, although there is no cap on punitive damages award under the CHRL, "the federal cap nonetheless provides guidance on what is considered an appropriate civil penalty for comparable misconduct").

The award is designedly generous.  The Court's role in assessing the constitutionality of a punitive damages award is not to substitute its judgment for the jury's, or to make the award

---

[30] The Court recognizes that the Title VII cap, if applicable, would limit the punitive award to $244,000, since the cap applies to the total of punitive and non-economic compensatory damages, and plaintiff has already been awarded $56,000 in damages for emotional distress.  However, the New York City statute does not contain such a cap.  The $300,000 amount thus is selected as reflecting an appropriate order of magnitude for punitive awards, and not in an (unjustifiable) attempt to conform the CHRL precisely to federal law.

that the Court would find appropriate were it the finder of fact. Rather, the Court's role is to remit the award to a figure that would not be excessive. While the Court as fact-finder might well select a lower figure, or decline to award punitive damages at all, the jury's verdict clearly reflects its view that the defendant's conduct warranted a substantial award of punitive damages, a view that the Court must respect even while finding that they jury's specific award was excessive. The Court thus seeks an amount that would be "maximally sufficient to serve the retributive and deterrent purposes of civil penalties without violating due process principles." TVT Records, 279 F. Supp. 2d at 461. While a larger amount would be out of proportion to the reprehensibility of the discriminatory act in this case, a lesser amount might not be a significant enough penalty to such a large entity as UBS as to make it an effective tool for deterrence of future discrimination. See Kuper, 2003 WL 359462, at *10 ("[T]he court may consider the defendant's size in evaluating the punitive to compensatory damage ratio."); Iannone, 941 F. Supp. at 415 (noting that a defendant's wealth is one factor to consider in evaluating an appropriate punitive damage ratio). Finally, this sanction bears approximately a 3:1 ratio to the compensatory damages awarded in this case, and is therefore within the range of ratios that courts have found to be constitutional.[31]

---

[31] Defendant also argues that any punitive damages award exceeding the Title VII cap must be vacated because, under New York law, Chandler was not a "superior officer" at UBS. Specifically, defendant argues that, under New York law, punitive damages "may only be awarded against an employer when one of its 'superior officers' orders, participates in or ratifies the outrageous conduct warranting punitive damages." (Def. Mem. 40, citing Orange & Rockland Utils., Inc. v. Muggs Pub, Inc., 739 N.Y.S.2d 610 (2d Dep't 2002).) As defendant concedes, the jury was properly instructed that in order to award punitive damages, it had to find that Chandler was a superior officer of UBS, a term that encompasses only "relatively important managerial personnel, with a high level of general managerial authority in relation to the nature and operation of the corporation's business." (Tr. 1398.) Whether a manager is a "superior officer" is a highly fact-intensive question, suitable for jury resolution, because superior officers

## V.      Discovery Sanctions

Finally, defendant requests that the Court impose monetary sanctions on plaintiff as a result of "plaintiff's misrepresentations and complete disregard for her discovery obligations," which defendant claims caused it "to incur excessive attorneys' fees and costs that would have been avoided had [plaintiff] complied with those clear obligations."  (Def. Am. Mem. of Law in Support of its Mot. for Sanctions for Pl.'s Disc. Abuses ("Def. Sanctions Mem.") at 1.) Defendant requests complete reimbursement for those fees and costs.  Plaintiff argues that none of her conduct was sanctionable, but involved, at most, "innocent" errors that "resulted in no prejudice to the [d]efendant whatsoever."  (Pl. Mem. of Law in Opp'n to Def.'s Mot. for Disc. Sanctions ("Pl. Sanctions Mem.") at 1.)  Although plaintiff's conduct was sanctionable, defendant has not established that it is entitled to all of its requested fees and costs.  Therefore, defendant's request will be granted in part and denied in part.

### A.      The Getz Claim

First, defendant requests fees and costs it incurred in its attempts to locate Steven Getz, a potential witness with respect to plaintiff's post-employment attempt to mitigate damages.  In responding to UBS's interrogatories regarding her mitigation efforts, plaintiff identified Getz as someone from whom she sought assistance in finding employment.  (Carney Decl. Ex. A.)

---

under New York law are not to be found "only . . . in the executive suite or topmost reaches of corporate government."  Loughry v. Lincoln First Bank, N.A., 67 N.Y.2d 369, 380 (1986).  The jury heard evidence that Chandler was the branch manager, supervised "several hundred" FAs, and had the authority to hire, fire and promote.  A reasonable jury could find him to be a superior officer.  See, e.g., Thompson v. American Eagle Airlines, No. 99 Civ 4529 (JGK), 2000 WL 1505972 (S.D.N.Y. October 6, 2000) (shift supervisor with power to fire reasonably held a superior officer); O'Donnell v. K-Mart Corp., 474 N.Y.S.2d 344, 347 (4th Dep't 1984) (assistant manager of K-Mart store reasonably found a superior officer).

Although Local Civil Rule 26.3(c) requires parties to provide the current or last known address and place of employment of potential witnesses, plaintiff provided in her initial disclosures only Getz's former work e-mail address. (Id.) By letter of June 25, 2004, defendant asked plaintiff to provide further identifying information for Getz. (Carney Decl. Ex. C at 1.) Plaintiff responded that she would provide such information (Carney Decl. Ex. D), but she did not.

Defendant attempted to contact Getz at the e-mail address provided, but was informed that Getz was no longer employed there. (Carney Decl. Exs. E, F.) As a result, on February 16, 2005, defendant again demanded that plaintiff provide complete and current contact information for Getz. (Carney Decl. Ex. F.) Plaintiff's counsel informed defendant that he would ask his client for further identifying information. (Carney Decl. Ex. G.) Once again, however, plaintiff failed to provide any further contact information.

Thereafter, plaintiff testified at her March 22, 2005, deposition that she had been in recent contact with Getz and that she had "a few numbers for him." (Carney Decl. Ex. H at 812-13, 815.) Significantly, though apparently unacknowledged at the deposition by either party, plaintiff had already provided one such valid number to defendant during discovery, when she disclosed an e-mail from Getz to her which included his current cell phone number. (Rozger Decl. Ex. 4.) It is undisputed that defendant was aware of the existence of that e-mail, as defendant used it as an exhibit, and plaintiff specifically referred to it, during plaintiff's deposition. At that time, however, apparently unaware that the cell phone number on the e-mail was current, counsel for defendant again requested production of Getz's current contact information. (Carney Decl. Ex. H at 814.) Once again, however, plaintiff failed to provide defendant with Getz's telephone numbers, current or last known address, or any other contact

information.

On August 29, 2005, plaintiff submitted an affidavit from Getz in opposition to defendant's summary judgment motion. By letter of September 8, 2005, defendant requested that the Court strike Getz's affidavit and prohibit plaintiff from using any evidence or testimony obtained from Getz in this litigation pursuant to Fed. R. Civ. P. 37(c)(1), arguing that plaintiff's ability to obtain an affidavit from Getz showed that she had effective contact information for Getz, but had failed to produce it. (Carney Decl. Ex. I.) In response, plaintiff submitted an affidavit stating that she had not had any contact information for Getz, other than his outdated work e-mail address, until Getz contacted her in August 2005. (Carney Decl. Ex. J.) Shortly thereafter, plaintiff provided defendant with Getz's cell phone number, which, as previously noted, had been provided earlier but apparently without either party realizing it, in preparation for plaintiff's March 22, 2005, deposition.

On September 28, 2005, during a telephone conference with counsel for both parties, the Court questioned whether plaintiff had committed perjury, either in her affidavit or in her deposition, in denying that she had current contact information for Getz. (Carney Decl. ¶ 3.) A perjury hearing was scheduled for March 10, 2006, to address the issue. (Id.) In preparation for that hearing, defendant subpoenaed plaintiff's telephone records and investigated the telephone numbers on plaintiff's telephone bills. (Carney Decl. Ex. L.) The records reflected that, between September 19, 2003, and February 12, 2005, plaintiff called Getz's cell phone several times. Defendant also deposed Getz on October 24, 2005. (Def. Sanctions Mem. 4.) At the deposition, Getz produced e-mail correspondence between himself and plaintiff, which contained both his home and cellular telephone numbers in his signature block. (Carney Decl. Ex. M.)

Although plaintiff's affidavit asserted that she had not heard from Getz again until August 2005, the e-mail produced by Getz was dated June 27, 2005. (Id.)

Due to scheduling conflicts, the perjury hearing was not held prior to trial. (Rozger Decl. Ex. 11.) At trial, plaintiff testified that her prior affirmations were correct in that she did not have any additional contact information at the time she was asked for it. She explained that her phone bill, at the time of Getz's incoming calls to her, did not show the numbers of the incoming calls, so she did not have access to his number by that route. (Tr. 277-79, 602.) In addition, plaintiff's phone bills did not show the phone numbers she called during the relevant period, pursuant to the policy of the phone company, and thus, plaintiff testified that she could not have ascertained his number by examining those records.[32] (See Rozger Decl. Exs. 12, 13.)

At the conclusion of trial, the Court found that plaintiff had not committed perjury in connection with her failure to provide Getz's contact information. The Court found that, while plaintiff's "culpable sloppiness [as to] compliance with discovery sanctions" reflected "a kind of casualness and a kind of lack of appreciation on the part of plaintiff of just how serious [her discovery] obligations were" (Tr. 1302-03), her actions were not intentional (id. 1299). Moreover, the Court found that her failure to provide Getz's contact information turned out not to be significant by the time of trial, as neither party called Getz as a trial witness, and the evidence offered by Tse at trial relating to her post-employment mitigation efforts was "minimal

---

[32] The records do reflect that Tse called Getz several times during the period when defendant was seeking his number, and Tse was failing to provide it. Plaintiff speculated that perhaps her calls simply responded to calls from Getz, which would not necessarily require that she have Getz's number on record. That, of course, would still not explain why, knowing that she was required to provide Getz's contact information to defendant, plaintiff did not obtain and record his number during any of her conversations with him.

and undisputed." (Id. 1300.) The Court also found that Getz's contact information may not have been "sufficiently prominent in [plaintiff's] mind at the time of her testimony and various affirmations" to warrant a finding of intentional falsehood. (Id.)

Although the Court found that plaintiff did not perjure herself in either her deposition or her affidavit, defendant now requests that the Court nevertheless impose sanctions against plaintiff for her conduct with respect to Getz's contact information. Defendant argues that "a failure to sanction plaintiff would send a message that a party, during discovery, can flout the truth and its discovery obligations and cause the adverse party to exert efforts and incur fees that otherwise would have been wholly unnecessary." (Def. Sanctions Mem. 11.) According to defendant, "sanctions for such conduct provides a strong deterrence to the non-compliant party and to others in the public." (Id., citing Legrande v. Adecco, 233 F.R.D. 253, 257 (N.D.N.Y. 2005).)

The Court's finding that plaintiff's failure to disclose Getz's contact information was not intentional does not preclude the entry of sanctions against her for failing to that information. It is well settled that "grossly negligent" conduct may be sanctioned under both Fed. R. Civ. P. 37 and the Court's inherent powers. Penthouse Int'l, Ltd. v. Playboy Entm't, Inc., 663 F.2d 371, 387 (2d Cir. 1981); see Metro. Opera Ass'n v. Local 100, Hotel Employees and Restaurant Employees Int'l Union, 212 F.R.D. 178, 219 (S.D.N.Y. 2003). Indeed, the Court has "broad discretion" to determine whether plaintiff's conduct was sanctionable, "[i]n view of the fact that the trial court has firsthand familiarity with all of the pertinent circumstances of the particular case." JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc., No. 03 Civ. 5562, 2005 WL 1958361, at *11 (S.D.N.Y. Aug. 16, 2005) (internal quotation marks and

citation omitted). Sanctions are appropriate "[w]hen a party seeks to frustrate [discovery] by . . . preventing disclosure of facts essential to an adjudication on the merits." Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1365 (2d Cir. 1991). "[A] party who flouts [her discovery obligations] does so at h[er] peril." Intertec Contracting A/S v. Turner Steiner Int'l, S.A., No. 98 Civ. 9116, 2001 WL 812224, at *11 (S.D.N.Y. July 18, 2001) (internal quotation marks and citation omitted).

In addition to the Court's inherent authority to impose sanctions, Fed. R. Civ. P. 37(c)(1) provides that the court "may impose" appropriate sanctions, including "reasonable expenses" and "attorney's fees" for a party's failure to "disclose information required by [Fed. R. Civ. P.] 26(a) or (e)" without "substantial[]" justification. Rule 37 "'places the burden on the disobedient party to avoid expenses [including attorneys' fees] by showing that his failure is justified or that special circumstances make an award of expenses unjust.'" JSC Foreign Econ., 2005 WL 1953861, at *11 (alteration in original), quoting 1970 Advisory Comm. Notes to Rule 37(b).

Courts in this circuit have often awarded attorneys' fees to sanction a party who disregards her discovery obligations. See Interscope Records v. Barbosa, No. 05 Civ. 5864, 2007 WL 14332 (E.D.N.Y. Jan. 3, 2007) (awarding attorneys' fees under Rule 37(c)(1) and the Court's inherent powers for providing false and misleading discovery responses); Legrande, 233 F.R.D. at 258 (awarding deposition costs under Rule 37(c)(1) and the Court's inherent power after concluding there was no justification for pro se plaintiff's "laissez-faire compliance with discovery"); Brick v. HSBC Bank USA, No. 04 CV 0129E, 2004 WL 1811430 (W.D.N.Y. Aug. 11, 2004) (awarding attorneys' fees and expenses in the amount of $147,635.74 under the Court's inherent powers for evasive and incomplete disclosure); Nike, Inc. v. Top Brand Co.

72

Ltd., 216 F.R.D. 259 (S.D.N.Y. 2003) (awarding reasonable attorneys' fees, inter alia, as a sanction for Rule 37(c)(1) violations); Monaghan v. SZS 33 Assocs., L.P., 154 F.R.D. 78 (S.D.N.Y. 1994) (awarding plaintiff attorneys' fees under Rule 37(c)(1) for defendant's negligent discovery abuses). Such an award is considered the mildest form of sanction under Rule 37. See Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1066 (2d Cir. 1979); Legrande, 233 F.R.D. at 256 n.1 ("There is a spectrum of sanctions ranging from the mildest of reimbursing for expenses to the harshest, order of dismissal or default.").

In this case, the Court has already found that plaintiff's failure to disclose Getz's full contact information was grossly negligent and reflected a lack of concern for the seriousness of her discovery obligations. (See Tr. 1301-02.) Plaintiff was aware that defendant appropriately and repeatedly demanded contact information for Getz, and she failed to provide it, or to seek to uncover it, even at a time when she was in contact with him. As previously noted, such neglectful conduct is sufficient to warrant sanctions. See Cine Forty-Second Street, 602 F.2d at 1066 (applying "deliberate tactical intransigence" or "gross . . . incompetence" standard); see also Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 113 (2d Cir. 2002) (applying ordinary negligence standard). Thus, plaintiff's conduct was sanctionable. The only remaining inquiry, therefore, is the appropriate sanction under these circumstances. In making that determination, the Court may consider a variety of factors, including whether defendant was aware of the sanctionable conduct, the prejudice to defendant caused by the conduct, and the extent of plaintiff's personal responsibility for the conduct. See, e.g., Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 852-54 (2d Cir. 1995).

73

Plaintiff argues that any sanction imposed here should be minor, because "the sum of [p]laintiff's negligence with regard to Getz is that she only informally pointed out his phone number on a document at her deposition, rather than taking the time to send a follow-up letter with the number to [d]efendant's counsel, and that she signed a certification that she did not have additional contact information for him, when in fact she had already produced his phone number, and had pointed it out at her deposition." (Pl. Sanctions Mem. 6.) Plaintiff is incorrect; her negligence went far beyond these two acts. For example, in her initial response to defendant's interrogatories, she provided only Getz's e-mail address, although she was clearly required to provide his full contact information pursuant to Local Civil Rule 26.3(c), and although, had she done a reasonable examination of her own records, she would have been able to provide at least his cellular phone number in her initial disclosures. In fact, the parties would have avoided this entire dispute had plaintiff at least partially complied with her discovery obligation in the first instance by performing a reasonable examination of the documents she disclosed to defendant; such an examination would have revealed Getz's current cellular phone number, and thus, plaintiff would have been able to provide that number along with his work e-mail in her initial disclosures.

In addition, plaintiff's disregard for her continuing discovery obligations under Rule 26(e)(1) alone deserves more than a "minor" sanction. In June 2004, defendant advised plaintiff that it was not able to reach Getz at the e-mail address provided. It was plaintiff's responsibility at that point, if not actively to search for Getz, then at least to keep defendant's search in mind when she did speak to him. It is undisputed that plaintiff spoke to Getz after June 2004, and at the latest, in February 2005. Because it is clear that plaintiff spoke to Getz at a time when she

knew that defendant was actively searching for him, she was obligated at that time to save his number and provide it to defendant.  Even if her failure to do so was not intentional, and even if, by the time her deposition occurred, she no longer had his number saved in her cell phone, that does not excuse her earlier failure to disclose his number when she knew that defendant was searching for it.

Moreover, plaintiff again ignored her continuing obligation to supplement her disclosures in June 2005, when Getz e-mailed her, again providing her with his full contact information.  Instead of passing that information along to defendant, she procured an affidavit from Getz without providing defendant with the opportunity to depose him, and she proceeded to file an erroneous affidavit stating that Getz had re-contacted her in August 2005 instead of June 2005.  Regardless of that error, however, as plaintiff knew that defendant was still searching for Getz's contact information in June 2005, it was her responsibility at that time to disclose his contact information, and not wait for the Court's intervention to do so.

Thus, the sanction for plaintiff's discovery abuse should be more than "minor."  Defendant requests full reimbursement for the fees and costs it incurred in its search for Getz's contact information.  However, although defendant is entitled to some of its fees and costs associated with its search for Getz's information, defendant is not entitled to a full reimbursement of those fees and costs, for three reasons.  First, any prejudice that resulted from defendant's belated deposition of Getz was caused partially by defendant's own conduct during discovery.  Specifically, it is undisputed that plaintiff disclosed to defendant during discovery an e-mail that contained Getz's prior work contact information as well as his current cellular phone number.  Defendant argues that it should not be held accountable for not locating that number

among the voluminous discovery provided to it by plaintiff (Def. Sanctions Reply 3); however, it is also undisputed that defendant knew about that e-mail at the time of plaintiff's deposition when she was asked to identify Getz's contact information on the e-mail. Although apparently neither party noticed that Getz's current cellular phone number was also listed on the e-mail, had defendant reasonably examined the document, it would have found the number and none of the subsequent efforts to cure plaintiff's negligent conduct would have been necessary. While this disclosure cannot excuse plaintiff's later negligent conduct nor her earlier failure to include Getz's number in her initial disclosures, defendant is not entitled to receive fees and costs for expenses it could have avoided had it properly reviewed the e-mail in the first instance.

Second, plaintiff's failure to disclose Getz's contact information caused little if any prejudice to defendant. Getz was not called as a witness at trial, and defendant was given the opportunity to depose him, albeit belatedly. And third, although plaintiff should be held responsible for her grossly negligent conduct, her failure to save Getz's phone numbers in her phone, or write them down and pass them to her attorney, do not constitute the sort of deliberate bad faith conduct that calls for the imposition of an excessively harsh monetary sanction here.

Thus, defendant is entitled to a reasonable portion of its attorneys' fees and costs incurred in searching for Getz, as it was plaintiff's inadequate initial disclosure that first created the situation, and as plaintiff was aware that defendant was having trouble locating Getz and did nothing to cure her previously inadequate disclosure, even though she was provided with that opportunity several times prior to October 2005, when that information was finally provided after the Court's intervention. Accordingly, the Court finds that defendant is entitled to $13,807.75 in sanctions here, which corresponds to half of the fees and costs associated with

defendant's search for Getz's contact information.  (Def. Sanctions Mem. 15.)  This sum reflects the fact that both parties bear some responsibility for the harm incurred here, and the fact that the conduct caused little if any prejudice to defendant at trial, while ensuring that future litigants do not exhibit such casual disregard for their discovery obligations.

B.      The Laptop Claim

Next, plaintiff requests fees and costs for plaintiff's negligent conduct with respect to her laptop computer.  During plaintiff's March 22, 2005, deposition, plaintiff testified that she possessed a laptop computer which contained information specific to her employment, and that the computer's log-on data would establish the dates that she was physically present at work, but that the computer had crashed since the time she was employed at UBS. (Carney Decl. Ex. H at 796-98.)  Plaintiff testified at her deposition that before the computer crashed she was able to create notes from the information stored on the hard drive reflecting the exact dates on which she had reported to work.  (Id.)  Plaintiff produced those notes during discovery in support of her contention that she did not abandon her job.  (Id.)  However, plaintiff did not produce the computer itself at that time – instead, she testified that she had discarded the computer after it crashed in 2003.  (Id. 114, 724, 796-98.)  Plaintiff also submitted an affidavit in opposition to defendant's motion for summary judgment in which she claimed that she had discarded the computer after she created the handwritten notes reflecting the dates she was physically present at the Madison Avenue Branch.  (Carney Decl. Ex. N ¶¶ 101-102.)

Approximately two years later, in February 2007, shortly before trial and only a few days before the parties' Joint Pre-Trial Order was due to be filed, plaintiff's counsel informed defendant that plaintiff had recently discovered the laptop computer at her parents' home.

(Carney Decl. Ex. O.)  Plaintiff's only explanation for the sudden discovery was that she had

"re[thought]" her prior representations during a recent court conference.  (Tr. 386.)  The parties

immediately sent the computer's hard drive to a forensic data recovery firm in an attempt to

retrieve any relevant data.  (Rozger Decl. Exs. 17-18.)  Plaintiff paid for the data retrieval.

(Rozger Decl. Ex. 19.)  Defendant received the results of a limited keyword search on March 21,

2007, two business days before the trial was scheduled to begin.  (Carney Decl. ¶¶ 5-7.)

Defendant reviewed approximately three boxes worth of documents obtained from the

limited search of the computer's contents in the short time before trial.  (Id. ¶ 7.)  Although most

of the documents recovered were not relevant to the lawsuit, some of those documents were

relevant to plaintiff's claims.  For example, the computer contained plaintiff's typed narratives

regarding her claims; pages of timelines and chronologies reflecting events during her

employment at UBS; references to daily notes plaintiff created and maintained regarding her

employment at UBS; and a letter to a Chinese-American organization concerning plaintiff's

discrimination claims.  (Id. ¶ 8.)  However, contrary to plaintiff's deposition testimony, the

search did not uncover any documents indicating which dates plaintiff was physically present at

work.  (Id. ¶ 9.)

Defendant now requests reimbursement for fees and costs associated with plaintiff's

negligent withholding of the laptop computer.  Specifically, defendant requests reimbursement

for expenses defendant "needlessly" incurred in (1) drafting a pre-trial spoliation motion

concerning plaintiff's laptop computer; (2) addressing plaintiff's last-minute discovery of the

computer with the Court and plaintiff's counsel; (3) addressing data retrieval issues with

plaintiff's counsel and an outside vendor; (4) making submissions to the Court concerning data

retrieval issues and how its pre-trial spoliation motion was affected; (5) drafting a new motion for sanctions based on plaintiff's misconduct with respect to the laptop computer and prejudice to defendant; (6) printing voluminous documents retrieved from the laptop computer; and (7) analyzing the documents retrieved from the laptop computer for relevancy. (Def. Sanctions Mem. 16.)

Defendant is clearly entitled to some of its fees and costs associated with plaintiff's withholding of the laptop computer. Plaintiff offered no reasonable explanation for her failure to produce the computer at an earlier date, and even if her failure to produce it earlier was not intentional, it was surely grossly negligent.[33] It is undisputed that the computer was at plaintiff's parents' home the entire time the litigation was pending, and there is no reasonable explanation why plaintiff could not have discovered it earlier had she been reasonably diligent in fulfilling her discovery obligations. Moreover, plaintiff claimed that she discarded the computer in 2003, *after* she instituted this lawsuit. Although it was later discovered that plaintiff actually left the computer at her parents' home and did not discard it, neither action was justified here – after plaintiff commenced this litigation, she should have retained the laptop computer as containing potentially relevant information to her lawsuit. Regardless of the reason why the computer was lost for two years, the original act that led to its loss was grossly negligent, and once again

---

[33] The production of notes favoring the plaintiff's case, coupled with the disappearance of the computer that contained the data that purportedly supported the notes, warrants some suspicion of plaintiff's motives, as does the fact that the computer, when belatedly found, apparently did not contain the data in question. On the other hand, a party intent on obstructing justice presumably would have allowed the computer to remain "lost." In any event, it is unnecessary to make a finding regarding plaintiff's intent. At a minimum, the failure to locate the computer was a gross dereliction of plaintiff's discovery obligations, particularly given the obvious importance of the data allegedly verifying the plaintiff's disputed attendance at work.

reflects plaintiff's blatant disregard for her discovery obligations.

Plaintiff argues that she should not be required to reimburse defendant for her culpable neglect, primarily because the documents retrieved from the computed proved to be only "ancillary" at trial, and therefore, did not cause much prejudice to defendant. Plaintiff's argument is unpersuasive. First, defendant introduced two documents at trial from the crashed hard drive that it would have otherwise not been able to introduce, one of which went directly to the issue of whether plaintiff was "afforded equitable access" to accounts at UBS (Pl. Sanctions Mem. 8), and the other which shed light directly on plaintiff's race discrimination claim. Moreover, even if those documents were only ancillary to defendant's case, the documents retrieved (or not retrieved) from the computer were highly relevant to plaintiff's credibility, as plaintiff testified during her deposition that she had kept notes on the computer reflecting her attendance at work but no such notes were recovered. Furthermore, it is undisputed that, due to plaintiff's negligent conduct, defendant only had enough time to perform a limited keyword search on the computer; had plaintiff not been negligent, defendant would have been able to perform a full search of the computer, and other, more relevant documents might have been uncovered, and the inherent distraction, and increased cost, of conducting computer searches during trial would have been avoided.

In addition, regardless of whether the computer actually produced documents relevant to the litigation, prejudice is only one factor to be considered in determining whether to award sanctions. For example, in DLC Management, 163 F.3d 124, the Second Circuit affirmed an award of attorneys' fees in the amount of $39,905 under the district court's inherent powers as a sanction for the late production of documents. In that case, after the close of discovery,

defendants produced a box of documents that plaintiffs had been requesting, after finding it in a "closet that defendants apparently had never bothered to search." 163 F.3d at 135. The district court sanctioned defendants' conduct, not just because it resulted in the withholding of relevant documents, but because defendants had exhibited a "conscious disregard" for their discovery obligations. Id. at 136. In affirming the sanction, the Second Circuit noted that the district court was authorized to impose this sanction under its "power to impose . . . submission to [the court's] lawful mandates," including discovery orders. Id. The Court of Appeals also recognized that a party's conduct may be sanctioned, not only if it was undertaken in "bad faith," but also if it was "vexatious[]" or "wanton[]." Id., quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991). Indeed, as defendant notes, accepting plaintiff's argument that she should not be held accountable for her grossly negligent conduct would be tantamount to permitting parties to engage in vexatious and wanton conduct during discovery, as long as the withheld evidence did not turn out to be the "smoking gun" in the case. (Def. Sanctions Reply 4.) Such a permissive policy would undermine the discovery process and give parties an incentive to roll the proverbial dice by withholding potentially relevant information and hoping that it does not turn out to be relevant at trial. See Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976) (noting that Rule 37 sanctions may be applied "to deter those who might be tempted to such conduct in the absence of such a deterrent").

Plaintiff also attempts to distinguish cases in which sanctions were imposed for negligent withholding of evidence by claiming that her conduct did not rise to the same level of culpability as the conduct of the parties in those cases. (Pl. Sanctions Mem. 9-12.) This argument is similarly unpersuasive. Even if the withholding of the laptop did not "rise to [the level of]

intentional misconduct," <u>Metro. Opera</u>, 212 F.R.D. at 222, the combination of plaintiff's

withholding of the laptop, her failure to disclose Getz's contact information, and the failure to

provide a damage calculation or disclose the damages chart before trial, reflects that her

"disobe[dience]" of her discovery obligations was not a discrete, isolated event, but instead a

pattern of "prolonged and vexatious obstruction of discovery." <u>Penthouse</u>, 663 F.2d at 388; <u>see</u>

<u>Metro. Opera</u>, 212 F.R.D. at 227 (listing "[t]he [h]istory . . . of [n]on-[c]ompliance" with

discovery obligations as one factor to consider in deciding whether to award sanctions).

Moreover, in those cases in which the obstructionist conduct was undertaken in bad faith or

intentionally, the courts often imposed much harsher sanctions than those sought here, for

example, by ordering a default judgment in favor of the non-offending party, <u>see</u>, <u>e.g.</u>, <u>Metro.</u>

<u>Opera</u>, 212 F.R.D. at 231 (ordering judgment for plaintiff on the issue of liability as sanction for

union's discovery abuses), or by entering an adverse inference against the offending party with

respect to the improperly withheld evidence, <u>see</u> <u>Reilly v. Natwest Markets Group Inc.</u>, 181 F.3d

253 (2d Cir. 1999). That plaintiff's conduct may not have been sufficiently egregious to require

such harsh consequences does not mean that her actions can be ignored.

Nevertheless, defendant is not entitled to all of the fees and costs it incurred with respect

to the laptop computer. As plaintiff correctly notes, some of these costs "would have been

incurred even if [plaintiff] had produced the laptop on time." (Pl. Sanctions Mem. 15.) For

example, defendant would have spent time reviewing the documents recovered from the laptop

regardless of when the laptop was produced – indeed, had plaintiff produced the computer

earlier, defendant might have spent *more* time reviewing its contents, as more documents might

have been recovered. In addition, even if plaintiff had not withheld the laptop, it is undisputed

that the computer crashed before it was transferred to her parents' home. Therefore, even had it been produced in 2003, defendant likely still would have been required to review voluminous documents obtained in the course of the data retrieval, as the retrieval method is based on keyword searches and thus generates both irrelevant and relevant documents. Moreover, defendant's decision to print "three boxes" of mostly irrelevant documents, simply to make a point to the Court at a conference held prior to trial that plaintiff's withholding of the laptop caused it prejudice, was a tactical decision that was unnecessary to cure the prejudice caused by plaintiff's conduct, and indeed, did not result in sanctions being imposed at that time. Finally, as it is undisputed that plaintiff paid for the data retrieval herself, defendant is not entitled to any costs associated with the actual data retrieval, including any costs it would have incurred in conferring with plaintiff about the proper method of retrieval, as defendant would have been required to incur those costs regardless of plaintiff's negligent conduct.

Thus, defendant is not entitled to reimbursement for the fees and costs it would have incurred in the normal course of litigation, nor is it entitled to those which were not directly caused by plaintiff's sanctionable conduct. Accordingly, defendant is entitled to fees and costs for the following expenses: (1) drafting a pre-trial spoliation motion concerning plaintiff's laptop computer;[34] (2) addressing plaintiff's last-minute discovery of the computer with the Court and

_____

[34] Plaintiff boldly argues that it should not be held accountable for the fees and costs associated with defendant's pre-trial motion for spoliation because that motion was denied by the Court. (Pl. Sanctions Mem. 16.) Plaintiff's argument is misplaced. Defendant's motion was not denied on its merits, but instead was withdrawn by defendant after plaintiff belatedly produced the laptop. (Carney Supp. Decl. ¶ 3.) Although defendant filed another pre-trial motion to sanction plaintiff for her discovery abuses (id.), that motion also was not denied, but instead was the basis for the Court's prior ruling that plaintiff had engaged in negligent conduct with respect to her computer (Tr. 1299). While the Court did not order sanctions at that time, defendant was permitted to brief the issue of possible sanctions after trial (id. 1302-03), which defendant has

83

plaintiff's counsel; (3) submissions to the Court concerning data retrieval issues and how its pre-trial spoliation motion is affected; and (4) drafting a new motion for sanctions based on plaintiff's misconduct with respect to the laptop computer and prejudice to defendant.

C.    The Damages Chart

Defendant also requests that the Court sanction plaintiff for her late production of the damages chart, and for her failure to disclose her back pay damages computation prior to trial. Specifically, defendant requests that, because "plaintiff did not disclose her calculations of damages to [defendant], either in her mandatory initial disclosures or in her discovery responses," the damages chart "should have been precluded pursuant to Federal Rule of Civil Procedure 37(c)." (Def. Sanctions Mem. 17.) Accordingly, defendant requests that the Court now vacate the economic damages award.[35] Defendant's request has, for the most part, been rendered moot by the Court's prior determination that, regardless of whether the chart should have been admitted into evidence during trial, plaintiff was not entitled to post-employment back pay. Thus, that portion of the economic damages award has already been vacated, and there is no need for an additional sanction.

In addition, to the extent that defendant also argues that plaintiff's testimony regarding her economic damages while she was actually on the Plan should similarly be excluded as a result of her failure to disclose her damages calculation prior to trial, that argument is

_____

now done. (See id. 1303 ("[I]t seems to me that the kind of sanction that strikes me as prima facie appealing has to do with additional attorney's fees that were incurred in trying to track these things down.").) Defendant is entitled to all of the fees and costs associated with these respective motions, which were the direct result of plaintiff's conduct.

[35] Defendant does not request any fees and costs associated with this claim.

84

unpersuasive, as the calculation of plaintiff's damages while she was on the Plan was based, not on her damages chart or on any other belatedly disclosed evidence, but on her W-2s, tax returns, and other evidence that was previously disclosed to defendant prior to trial. Indeed, defendant concedes that plaintiff's "damages calculation" as reflected by the damages chart "had nothing whatsoever to do with any damages arising from her placement on the [P]lan, the only claim on which plaintiff was successful." (Def. Sanctions Reply 6; see Def. Mem. 23 (stating that the chart had "no relevance to damages from placement on the Plan" and related "solely to loss of employment damages in the form of back and future pay").) Moreover, the jury could have calculated plaintiff's economic damages resulting from her placement on the Plan on defendant's exhibit alone, and did not need to resort to plaintiff's testimony or evidence to make that calculation. (See Def. Ex. 77.) Therefore, any prejudice caused by the damages chart was harmless with respect to plaintiff's economic damages while on the Plan, and those damages were otherwise adequately supported by plaintiff's testimony and the documentary evidence submitted at trial. See Atkins v. County of Orange, 372 F. Supp. 2d 377, 395 (S.D.N.Y. 2005) (noting that, while courts have broad discretion to order relief for sanctionable conduct, "preclusion [of evidence] is not generally ordered"), citing Semi-Tech Litig. LLC v. Bankers Trust Co., 219 F.R.D. 324, 324 (S.D.N.Y. 2004); see also Babcock v. Rezak, No. 96-CV-0394E, 2002 WL 31654995, at *1 (W.D.N.Y. Nov. 6, 2002) (noting that the preclusion of testimony is "a drastic remedy and should only be applied in . . . rare cases").

D.     Sanctions Motion

Finally, defendant requests that plaintiff reimburse it for the fees and costs associated with the filing of its sanctions motion.  Such fees and costs are properly reimbursable where a party succeeds on a motion for sanctions.  See Pastorello v. City of New York, No. 95 Civ. 470, 2003 WL 1740606, at *13 (S.D.N.Y. Apr. 1, 2003); Monaghan, 148 F.R.D. at 511.  However, because defendant only succeeded on approximately half of the claims in this motion, defendant is only entitled to half of its fees and costs associated with the filing of this motion.  Accordingly, defendant is awarded $16,666.75 in connection with the preparation of the sanctions motion.  (See Carney Supp. Decl. ¶¶ 6-7.)

## CONCLUSION

Accordingly, for the reasons set forth above, defendant's motion for judgment as a matter of law, or in the alternative, a new trial, with respect to liability, is hereby denied.  With respect to damages, the Court's denial of defendant's motion for a new trial is conditioned upon the acceptance by plaintiff of a remittitur of the punitive damages award to $300,000 and the economic damages award to $45,000, along with an unreduced award of non-economic compensatory damages in the amount of $56,000, for a total judgment of $401,000.  Plaintiff shall elect in writing either a remittitur or a new trial on economic and punitive damages within 21 days of the filing of this Opinion and Order.

Defendant's motion for sanctions is granted in part and denied in part.  Plaintiff is directed to pay defendant $13,307.75 in connection with her failure to disclose Getz's contact information, and $16,666.75 in connection with the filing of this sanctions motion.  Finally, plaintiff is directed to pay defendant a sum in connection with the improper withholding of the

laptop computer, to be determined upon defendant's submission of documentation of the fees

and costs identified as recoverable in the Court's Opinion. Defendant shall submit the relevant

documents reflecting its fees and costs within 21 days of the filing of this Opinion and Order.

SO ORDERED.

Dated: New York, New York
      February 19, 2008

GERARD E. LYNCH
United States District Judge